119    655
s78NW 893
131    ²324

119    655
184     10

119    655
142    ¹486

BOARD OF FIRE & WATER COMMISSIONERS OF MAR-
QUETTE *v.* WILKINSON.

1. PUBLIC MONEYS—DEPOSIT—COMMINGLING WITH PRIVATE FUNDS.
    1 How. Stat. §§ 424, 427, prohibiting public officials from
    commingling public moneys with their own, or with the
    money of any other person, firm, or corporation, and from
    receiving, directly or indirectly, any pecuniary or valuable
    consideration as an inducement for the deposit of the public
    moneys with any particular bank, firm, or corporation, are
    · violated where the treasurer of a city fire and water commis-
    sion deposits moneys received for water rates in a private
    bank conducted by him, and commingles them with the
    funds of the bank.

2. TRUSTS—BANK DEPOSIT—PUBLIC MONEYS.
    City funds deposited by the treasurer of a municipal board in

his own bank, and commingled with the funds of the bank, in violation of 1 How. Stat. §§ 424, 427, relating to the safe-keeping of public moneys, constitute a trust fund, notwith-standing the treasurer had the legal title to the moneys, and notwithstanding such deposit was authorized by the board.

3. SAME — INSOLVENCY — PURSUIT OF TRUST FUND — BURDEN OF PROOF.

The receiver of an insolvent bank cannot be required to re-pay the beneficiary in a trust deposit in preference to general creditors, unless the claimant can show, by a clear preponder-ance of the evidence, that there remains in the hands of the receiver either the specific deposit, or specific funds or prop-erty into which the deposit can be traced.

4. SAME—GENERAL DISBURSEMENT—PRESUMPTION.

General disbursements by a trustee from a specific fund into which a trust fund is traced will be presumed, in the absence of evidence to the contrary, to have been made from other than the trust moneys.

5. SAME—BANK ACCOUNTS—DRAFTS.

During the three months immediately preceding the failure of a bank, it received in cash $6,000 of public funds, which, though a trust deposit, it placed in the general cash fund. Within the time specified, the bank paid certain drafts upon the public moneys, in an aggregate sum, however, less than the amount that stood to the credit of the fund when the $6,000 was deposited. The earlier balance could not be traced into the general cash fund, but an amount in excess of $6,000 remained in that fund when the bank passed into the hands of a receiver. *Held*, that the drafts should be charged against the earlier credit, and a trust declared in $6,000 of the sum remaining in the general cash fund.

Appeal from Marquette; Stone, J. Submitted November 18, 1898. Decided April 18, 1899.

Petition by the board of fire and water commissioners of the city of Marquette against Edwin C. Wilkinson and Albert E. Miller, assignees for creditors of James M. Wilkinson, to reach funds alleged to be held in trust. From a decree denying the petition, petitioner appeals. Reversed.

*George P. Brown* ( *Charles R. Brown*, of counsel), for petitioner.

*A. E. Miller* ( *A. B. Eldredge*, of counsel), for defendants.

HOOKER, J.   The board of fire and water commissioners of the city of Marquette is a corporation organized by Act No. 243, Laws 1869.   This act provides for the selection of a secretary and a treasurer from among the members of the board.   The board was organized soon after its creation, and from that time its funds were deposited in the First National Bank of Marquette; the water consumers being in the habit of paying their rates at the bank.   The money was credited to the board, and checked out by the secretary.   James M. Wilkinson was a member of the board from a time previous to December 10, 1883, to his death, which occurred January 24, 1898.   In 1883 he was engaged in the business of banking, with a Mr. Campbell, under the name of Campbell & Wilkinson.   The following is a record of the proceedings of the board for December 10, 1883:

"The secretary informed the board that all the accommodation in the banking business received by the board was had at the bank of Campbell & Wilkinson, and that the banking business was done at the First National Bank, and asked the board if all the business could not be done at Campbell & Wilkinson's bank; and on motion it was resolved that all business was to be done at Campbell & Wilkinson's bank, commencing January 1, 1884."

On January 1, 1884, the following proceedings were had:

"The president stated that the banking was to be done at Campbell & Wilkinson's bank; from this, it would be well for this board to elect a treasurer, out of its number, to receive all moneys, and give receipts for same, and take the bank's receipts for deposits.   J. M. Wilkinson was elected as treasurer of this board, and the following resolution was unanimously adopted: '*Resolved*, that

119 MICH.—42.

the moneys of this board shall be paid over to the treasurer of this board, and he is hereby authorized to give his receipt, in the name of this board, for all money which he may receive for this board.'"

The money of the board was thereupon transferred to the bank of Campbell & Wilkinson, and the business of the board was carried on there until the death of Campbell, in 1889, in the same way that it had been done with the First National Bank. The water consumers paid their money to the bank, the bank credited it on a book kept for the purpose, and, by deposit slips, placed the amount to the credit of the board. The money was drawn, as wanted, upon ordinary bank checks signed by the secretary, who kept the accounts. In December, 1889, Mr. Campbell died, and Mr. Wilkinson continued in the banking business until the time of his death; and no change whatever was made in the business of the bank, or in the board's dealings with the bank, until April 26, 1893, when, a change having been made in the city charter creating a controller, and requiring "all accounts and demands against the city and all boards thereof" to be audited by the controller, and the orders drawn in payment thereof to be countersigned and registered by the controller ( Act No. 323, Local Acts 1893, chap. 9, § 3 ), this led to the use of orders being drawn upon the treasurer, which orders were paid by the bank, and returned to the secretary, exactly as the checks had been before. On January 22, 1898, Wilkinson made a general assignment to the defendants for the benefit of his creditors, but made no schedule of his property. He died, as stated, two days later. The assignees took possession of his property. The petition is filed for the purpose of recovering a balance of $11,376.42, the amount which is claimed to have been in Wilkinson's hands, of the funds of the board. It proceeds upon the theory that this was a trust fund, and that the petitioner's claim should have precedence over those of other creditors of Wilkinson.

The first contention of the appellees is that the board

authorized the loan of the funds (*i. e.*, that it directed their deposit in banks, with the expectation that they would become the money of the banks holding them, and be used as the money of ordinary depositors is used by banks), and that, therefore, the relation of debtor and creditor arose between the bank and the board, as in other cases, and that the claim of the board is not a preferred claim, because the money was not held in trust.

In 1875 the legislature passed "An act to provide for the safe-keeping of public moneys." Act No. 131, Pub. Acts 1875 (1 How. Stat. §§ 423–430). Among its provisions are the following:

"SECTION 1. *The People of the State of Michigan enact*, that all moneys which shall come into the hands of any officer of the State, or of any officer of any county, or of any township, school district, highway district, city, or village, or of any other municipal or public corporation within this State, pursuant to any provision of law authorizing such officer to receive the same, shall be denominated public moneys, within the meaning of this act.

"SEC. 2. It shall be the duty of every officer charged with the receiving, keeping, or disbursing of public moneys to keep the same separate and apart from his own money, and he shall not commingle the same with his own money, nor with the money of any other person, firm, or corporation.

"SEC. 3. No such officer shall, under any pretext, use, nor allow to be used, any such moneys for any purpose other than in accordance with the provisions of law; nor shall he use the same for his own private use, nor loan the same to any person, firm, or corporation without legal authority so to do.

"SEC. 4. In all cases where public moneys are authorized to be deposited in any bank, or to be loaned to any individual, firm, or corporation, for interest, the interest accruing upon such public moneys shall belong to and constitute a general fund of the State, county, or other public or municipal corporation, as the case may be.

"SEC. 5. In no case shall any such officer, directly or indirectly, receive any pecuniary or valuable consideration as an inducement for the deposit of any public moneys with any particular bank, firm, or corporation.

"Sec. 6. The provisions of this act shall apply to all deputies of such officer or officers, and to all clerks, agents, and servants of such officer or officers."

Section 429 makes violations of this act punishable by fine and imprisonment.

Wilkinson was elected treasurer in 1884, and a resolution was adopted that the moneys of the board should be paid over to the treasurer of the board. The funds were afterwards deposited with Campbell & Wilkinson. This was done by direction of the board, and after Campbell's death the board seems to have been content to have Wilkinson treat the same as a deposit in his bank. If the law of 1875 has application to this board,—and we think that it has,—the legal custodian of the funds of this board had no right to deposit these funds in a banking institution in which he was a stockholder or partner; for section 427 prohibited his receiving, directly or indirectly, any pecuniary or valuable consideration, and section 424 prohibited his commingling the money with that of himself or any other person, firm, or corporation. If we should construe this section liberally, and say that it was not designed to prohibit a treasurer from depositing his funds in a bank in the ordinary way, we should be required to except deposits in banks in which he has a pecuniary interest. The deposit with Campbell & Wilkinson was in violation of this law, and no order of the board could make it lawful. Still more clearly improper was the practice adopted by Wilkinson of using this fund with his own money in his own banking business. This was a trust fund, as much as though Wilkinson had been a farmer or broker or contractor or merchant, and had used the fund in his business. It does not follow that the fund is not a trust fund because he had the legal title to the money, though that fact may protect one who receives the money innocently.

In the case of *People* v. *Bringard*, 39 Mich. 22 (33 Am. Rep. 344), it was said that:

"We have no hesitation in holding that whenever any

township treasurer misappropriates his trust funds to his private purposes, and fraudulently refuses to account for them, he comes as plainly within the law as if he made a similar misuse of specific coins or bills, which he had no right to exchange for their equivalents."

The case recognized the rule that such officers become responsible as debtors, and not bailees, and that they become owners of the money they receive. See *Perley* v. *County of Muskegon*, 32 Mich. 139 (20 Am. Rep. 637), and cases cited. But it does not follow that the fund is not a trust fund, which a court of equity may require the application of to the discharge of the trust, as was held in the recent case of *City of Marquette* v. *Wilkinson*, *ante*, 413. The case of *People* v. *Wadsworth*, 63 Mich. 500, does not, in our opinion, militate against this, as the question there was whether one was necessarily guilty of embezzlement of public funds of which he was custodian, lost through insolvency, said funds having been on deposit in his bank by arrangement with the city treasurer. It was only held that a fraudulent intent was essential to *that offense*.

In the case before us, Wilkinson was a member of the board, and its treasurer. He received its funds, through his clerks, and he had no right to mingle and use them with his private funds. It should have been kept as a special fund, and, though it was not, it cannot be said that a court of equity may not apply it to its proper use, if it can find the fund. In *City of Lansing* v. *Wood*, 57 Mich. 211, Mr. Justice CAMPBELL uses this language in referring to cases holding that the money which officers deposit in banks is not a public bailment, but becomes a private debt from the banker to the officer depositing it: "But it does not follow that such an officer becomes, as to the public, the absolute owner of the funds in his hands, so that no one can question the use made of them." And he adds that in *People* v. *McKinney*, 10 Mich. 54, and *People* v. *Bringard, supra*, it was held that "a public trust fund does not lose its character by changing the

specific moneys which make it up, and in the latter case the duty of the officer to keep such money entirely separate from his own was fully recognized." The law by which the board was created requires the election of a treasurer, and, though it does not prescribe his duty, the custody of funds is so uniformly considered the principal duty of such officers in corporations that it may be fairly implied. Moreover, the resolution quoted placed the money in the hands of the treasurer, if the board had control of its custody. The treasurer took this fund, and placed it in the custody of his copartner and himself. The collections and disbursements were made by their clerks, by whom the treasurer's account, so far as there appears to have been any, was kept. But, whatever may be said of the relation that the firm of Campbell & Wilkinson sustained to these funds, when the former died the moneys on hand belonging to the board, and those subsequently collected, passed into the hands of Wilkinson. If the act of 1875 applied, he was prohibited from mingling them with his own moneys; and, if it did not, he still held them by virtue of his office, and had no right to convert them to his own use. The fund was a trust fund in either case.

Having reached the conclusion that the funds of the board in the hands of its treasurer constituted a trust fund, it remains to ascertain whether it can be collected from the receivers. This involves questions of law as well as fact. The theory upon which property is taken from a receiver, and paid to a beneficiary, is that the court is able to find in the hands of the receiver property, or its proceeds, which was held by the insolvent, not in his own absolute right, but charged with a trust. In such a case a court of equity will hold that it is not subject to the claims of other creditors. But when the fund received in trust has been dissipated, so that it cannot be traced into some other specific property or fund, the only remedy of the beneficiary is to share equally with other creditors. In its origin, this right to follow a trust fund was limited. Early cases went only to the extent of holding that the

beneficiary of property held by a trustee could follow it, and retake it from the possession of such trustee, or others in privity with him, and not *bona fide* purchasers for value, whether such property remained in its original form or in some other or substituted form, so long as it could be ascertained to be the same property, or the product or proceeds thereof, but that such right ceased when the means of ascertainment failed, as when the subject of the trust was money, or had been converted into money, and then mixed and confounded in a general mass of money of the same description, so as to be no longer divisible or distinguishable. *Taylor* v. *Plumer*, 3 Maule & S. 575. The case of *Cavin* v. *Gleason*, 105 N. Y. 262, recognizes this rule and its limitations. It is there said:

"It is clear, we think, that, upon an accounting in bankruptcy or insolvency, a trust creditor is not entitled to a preference over general creditors of the insolvent merely on the ground of the nature of his claim; that is, that he is a trust creditor, as distinguished from a general creditor. We know of no authority for such a contention. The equitable doctrine that, as between creditors, equality is equity, admits, so far as we know, of no exception founded on the greater supposed sacredness of one debt, or that it arose out of a violation of duty, or that its loss involves greater apparent hardship in one case than another, unless it appears, in addition, that there is some specific, recognized equity, founded on some agreement, or the relation of the debt to the assigned property, which entitles the claimant, according to equitable principles, to preferential payment. If it appears that trust property specifically belonging to the trust is included in the assets, the court, doubtless, may order it to be restored to the trust. So, also, if it appears that trust property has been wrongfully converted by the trustee, and constitutes, although in a changed form, a part of the assets, it would seem to be equitable, and in accordance with equitable principles, that the things into which the trust property has been changed should, if required, be set apart for the trust, or, if separation is impossible, that priority of lien should be adjudged in favor of the trust estate for the value of the trust property, or funds, or pro-

ceeds of the trust property, entering into, and constituting a part of, the assets. This rule simply asserts the right of the true owner to his own property. But it is the general rule, as well in a court of equity as in a court of law, that in order to follow trust funds, and subject them to the operation of the trust, they must be identified. A court of equity, in pursuing the inquiry and in administering relief, is less hampered by technical difficulties than a court of law; and it may be sufficient, to entitle a party to equitable preference in the distribution of a fund in insolvency, that it appears that the fund or property of the insolvent remaining for distribution includes the proceeds of the trust estate, although it may be impossible to point out the precise thing in which the trust fund has been invested, or the precise time when the conversion took place. The authorities require at least this degree of distinctness in the proof before preference can be awarded."

In *Atkinson* v. *Printing Co.*, 114 N. Y. 175, this language was approved.

In *Holmes* v. *Gilman*, 138 N. Y. 376 (20 L. R. A. 566, 34 Am. St. Rep. 463), the following language appears:

"The claim of the plaintiff to recover the moneys arising from the payments of these policies is based upon the principle which allows a *cestui que trust* to follow trust funds, and to appropriate to himself the property into which such funds have been changed, together with the increased value of such property, provided the trust fund can be clearly ascertained, traced, and identified, and provided the rights of *bona fide* purchasers for value, without notice, do not intervene. The right has its basis in the right of property, and the court proceeds on the principle that the title has not been affected by the change made of the trust funds, and the *cestui que trust* has his option to claim the property and its increased value as representing his original fund. The right to follow and appropriate ceases only when the means of ascertainment fail. It is a question of title."

In discussing this subject in the case of *Frelinghuysen* v. *Nugent*, 36 Fed. 239, Mr. Justice Bradley said:

"Another difficulty in the complainant's case is the want of identity of the property claimed with the pro-

.ceeds of the money abstracted from the bank.   Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it, the equity attaching only to the very property misapplied.   This right was first extended to the proceeds of the property, namely, to that which was procured in place of it, by exchange, purchase, or sale.   But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost.   Finally, however, it has been held, as the better doctrine, that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor.   This is as far as the rule has been carried. The difficulty of sustaining the claim in the present case is that it does not appear that the goods claimed—that is to say, the stock on hand, finished and unfinished—were, either in whole or in part, the proceeds of any money unlawfully abstracted from the bank.   On the contrary, the goods and stock on hand were purchased of the other creditors of Nugent & Co. almost entirely, if not wholly, on credit, and really stand in the place of, and represent the debts of, the firm due and owing to said creditors.   This is true with regard to all the raw stock on hand, and with regard to all the stock and materials from which the manufactured or partially manufactured goods were produced.   If any moneys derived from the bank entered into the latter, they were those moneys which were regularly drawn by checks of the firm weekly for the payment of their hands. It seems impossible, therefore, to sustain any such general charge or trust upon the goods and property of Nugent & Co. as that which has been set up and claimed by the complainant."

The supreme court of Massachusetts, in *Little* v. *Chadwick*, 151 Mass. 109 (7 L. R. A. 570), speaking through Mr. Justice Allen, said:

"When trust money becomes so mixed up with the trustee's individual funds that it is impossible to trace and identify it as entering into some specific property, the trust ceases.   The court will go as far as it can in thus tracing and following trust money; but when, as a matter of fact, it cannot be traced, the equitable right of the

*cestui que trust* to follow it fails. Under such circumstances, if the trustee has become bankrupt, the court cannot say that the trust money is to be found somewhere in the general estate of the trustee that still remains. He may have lost it with property of his own, and in such case the *cestui que trust* can only come in and share with the general creditors."

The case of *Nonotuck Silk Co. v. Flanders*, 87 Wis. 237, is an interesting case,—the more so as it overrules some prior cases which took advanced ground upon the subject of trust funds. It is there said, quoting from Jessel, M. R., in *Knatchbull v. Hallett*, 13 Ch. Div. 696:

"The guiding principle is that a trustee cannot assert a title of his own to trust property. If he destroys a trust fund by dissipating it altogether, there remains nothing to be the subject of the trust. But so long as the trust property can be traced and followed into other property into which it has been converted, that remains subject to the trust."

The court continued:

"That case is as favorable to the claim of the plaintiff as any in the English courts; and yet it nowhere sanctions the proposition that the owner of the property or money intrusted is entitled to a preference over other creditors of an insolvent estate out of property or assets to which no part of the trust fund, or the proceeds thereof, is traceable. All such cases turn upon the question of fact whether the trust property or fund, or the proceeds thereof, are traceable into any specific property or fund."

The opinion is replete with authorities in support of the rule laid down by it.

In *Slater v. Oriental Mills*, 18 R. I. 352, the supreme court of Rhode Island refuses to hold that:

"Where one's property has been wrongfully applied and dissipated by another, a charge remains upon the estate of the latter for the amount thus wrongfully taken, upon the ground that his estate is thereby so much larger, and that the trust property is really and clearly there, in a substituted form, although it cannot be directly traced."

Proceeding with the discussion, that court said:

"This view is pressed with much skill and some authority, but we are unable to adopt it. While one who has been wronged may follow and take his own property or its visible product, it is quite a different thing to say that he may take the property of somebody else. The general property of an insolvent debtor belongs to his creditors, as much as particular trust property belongs to a *cestui que trust*. Creditors have no right to share in that which is shown not to belong to the debtor, and, conversely, a claimant has no right to take from creditors that which he cannot show to be equitably his own. But right here comes the argument that it is equitably his own, because the debtor has taken the claimant's money and mingled it with his estate, whereby it is swelled just so much. But, as applicable to all cases, the argument is not sound. Where the property, or its substantial equivalent, remains, we concede its force; but, where it is dissipated and gone, the appropriation of some other property in its stead simply takes from creditors that which clearly belongs to them. In the former case, as in *Pennell* v. *Deffell*, 4 De Gex, M. & G. 372, and in *Re Hallett's Estate* (*Knatchbull* v. *Hallett*), 13 Ch. Div. 696, the illustration may be used of a debtor mingling trust funds with his own, in a chest or bag. Though the particular money cannot be identified, the amount is swelled just so much, and the amount added belongs to the *cestui que trust*. But in the latter case there is no swelling of the estate, for the money is spent and gone, or, as respondent's counsel pertinently suggests, 'Knight Bruce's chest, Jessel's bag, is empty.' Shall we therefore order a like amount to be taken out of some other chest or bag, or out of the debtor's general estate? Suppose the general estate consists only of mills and machinery acquired long before the complainants' money was appropriated; upon what principle could that property be taken to reimburse them? But the complainants say: 'Our money has been misappropriated by the debtor without our consent and without our fault. Why should we not be reimbursed out of his estate?' Undoubtedly, it is right that every one should have his own; but, when a claimant's property cannot be found, this same principle prevents the taking of property which equitably belongs to the creditors of the trustee to make it up. The creditors have done no wrongful act, and should not be called upon, in any way, to atone for the miscon-

duct of their debtor. It is an ordinary case of misfortune on the part of claimants whose confidence in a trustee or agent has been abused.

"In examining the question upon authority, we think it is equally clear that there can be no equitable relief except in cases where the fund claimed is in some way apparent in the debtor's estate. Of the cases cited by the complainants, only four go to the extent of holding that a *cestui que trust* is entitled to a lien for reimbursement on the general estate of the trustee where the trust fund does not in some form so appear. These are *Davenport Plow Co.* v. *Lamp*, 80 Iowa, 722 (20 Am. St. Rep. 442); *Mc-Leod* v. *Evans*, 66 Wis. 401 (57 Am. Rep. 287); *Francis* v. *Evans*, 69 Wis. 115; *Bowers* v. *Evans*, 71 Wis. 133. In the first of these cases the court lost sight of the distinction, which we desire to make clear, between funds remaining in the estate, which go to swell the assets, and funds which, having been dissipated or used in the payment of debts, do not remain in the estate, and so do not swell the estate. Upon the former fact, as we have stated above, we concede the right to relief. But the court, in the Iowa case, seems to ignore this very important distinction, and in so doing overthrows the foundation on which its decision is based, for it says, 'The creditors, if permitted to enforce their claims as against the trust, would secure the payment of their claims out of trust moneys.' Now, how can this be so if the trust moneys, or their substantial equivalent, are not there? The court assumes that the payment of debts is the same thing as an increase of assets, or, perhaps; that it works the same result to a creditor, by increasing his dividends. But this is not so. How the satisfaction of a debt by incurring another of equal amount either decreases one's liabilities or increases his assets can only be comprehended by the philosophic mind of a Micawber. If a debtor is solvent, it is all right either way, because he will have enough to pay everything he owes; but, if he is insolvent, the injustice of the doctrine of the Iowa court is made almost painfully plain by the following illustration from the dissenting opinion of Taylor and Cassoday, JJ., in *Francis* v. *Evans*, *supra:* 'Supposing that an insolvent debtor, D., has only $1,000 of property, but is indebted to the amount of $2,000, one-half of which is due to A. and the other half to B. In this condition of things, D.'s property can only pay 50 per

cent. of his debts. By such distribution, A. and B. would each be equitably entitled to $500. Now, suppose D., while in that condition, collects $1,000 for F., but instead of remitting to him the money, as he should, he uses it in paying his debt in full to A. By so doing, D. has not increased his assets a penny, nor diminished his aggregate indebtedness a penny. The only difference is that he now owes $1,000 each to B. and F., whereas he previously owed $1,000 each to A. and B. Now, if F. is to have preference over B., then his claim will absorb the entire amount of D.'s property, leaving nothing whatever for B. In other words, the $500 to which B. was equitably entitled from his insolvent debtor, upon a fair distribution of the estate, has, without any fault of his, been paid to another, merely in consequence of the wrongful act of the debtor.' It is impossible to state the case more clearly. The illustration demonstrates that the mere fact that a trustee has used the money does not show that it has gone into his estate. If used to pay debts, he has simply turned it over to a creditor, thereby giving him a preference, while his own estate and indebtedness remain exactly as before, because he owes the same amount to his *cestui que trust*, from whom he has taken it. Suppose he had stolen the money, and turned it over to somebody from whom it could not be reclaimed; can any one say the owner should have an equitable lien upon the thief's insolvent estate, in preference to his creditors? They and the owner are equally innocent."

See, also, *National Bank* v. *Insurance Co.*; 104 U. S. 54.

We think it unnecessary to quote at length from our own authorities, which point in the same direction. *Sherwood* v. *Milford State Bank*, 94 Mich. 78, recognizes the principle that the trust property must be traceable. *Sherwood* v. *Central Michigan Savings Bank*, 103 Mich. 109, goes no further than to hold that, where money is traced to a fund, it will be presumed that the trust property is the last to be paid out. In *Wallace* v. *Stone*, 107 Mich. 196, it was said that, unless the fund can be identified as being or containing the actual fund, the trust cannot be enforced against general creditors. Many authorities are cited. This language was in a dissenting opinion,

but the dissent rested upon a difference of opinion relating to the facts, not law, and the rule there stated was approved by the full bench in the later case of *Sunderlin* v. *Mecosta County Savings Bank*, 116 Mich. 281.

The overruled Wisconsin cases are made the subject of the following comment in the case of *Little* v. *Chadwick*, *supra:*

"In Wisconsin a majority of the court has declared that it is not necessary to trace the trust fund into any specific property in order to enforce the trust, and that, if it can be traced into the estate of the defaulting agent or trustee, this is sufficient. *McLeod* v. *Evans*, 66 Wis. 401, 409 (57 Am. Rep. 287). But this seems to us to be stated too broadly."

This review of cases might be extended indefinitely, as will be shown by the numerous citations contained in the cases discussed. They seem to effectually dispose of the claim that the entire estate of an insolvent trustee can be subjected to the claim of a *cestui que trust*, to the exclusion of general creditors, and firmly establish the proposition that one who seeks such relief must be able to trace the trust property to some specific fund or piece of property, and that, when this is done, there is a presumption that what remains of such fund or article is the trust fund, or its proceeds. The burden of proof is upon the complainant, and, in the opinion of Mr. Justice Bradley, "he should make it out, not only by preponderance of proof, but by a very clear preponderance." *Frelinghuysen* v. *Nugent*, 36 Fed. 237.

In this case it is impossible to say that the estate contains the proceeds of any checks received in payment for water rates, because it is impossible to say what disposition was made of such checks or their proceeds. The record shows $11,376.42 to be the balance due the board when the receivers took charge. This all accrued after April 14, 1891, because there was an overdraft at that time. It is difficult to tell how much of this was cash paid in. There is, however, some testimony on the sub-

ject. · Edwin C. Wilkinson, the son of James M. Wilkinson, testifies that from November 1, 1897, to the day on which the bank closed its doors, one-third of the amount paid in for the water board, or a little more, was paid by checks, and that, according to his best judgment, the amount was $3,176.14. That was a little more than one-third, for the amount deposited during that period was $9,208.18. It would follow that $6,032.04 was deposited in cash. During the same period there was drawn out $4,265.46, but this was $2,168.24 less than the amount standing to the credit of the board on November 1st. Unless we are to say that the amount drawn out should be applied against the cash paid in, viz., $6,032.04, this sum may be presumed to have been in the treasury when the bank was closed. There is no reason why we should say it, as it does not appear that these payments should not be charged against the older credit. We think it may be justly said that $6,032.04 of the cash received for the board found its way to the general cash fund of the bank within the last three months that business was done at the bank. We find an amount exceeding that sum in the fund when the assignees took it. We will presume, in the absence of proof to the contrary, that it was the trust fund that remained.

The decree will be reversed, and a decree entered here in favor of the complainant for the sum of $6,032.04, with costs of both courts.

The other Justices concurred.