## Jonas H. Perley and another v. The County of Muskegon.

*Deposits: Banks: Money: Title.* Money deposited in a bank otherwise than as a special deposit becomes the property of the banker, and he becomes the debtor of the depositor.

*Public treasurers: Deposits.* Under the common law there seems to be nothing which distinguishes public treasurers and depositaries in this regard from any other financial managers.

*Public officers: Deposits: Ownership: Responsibility: Bailee: Guarantor.* If an officer is required or authorized by law to make deposits in any particular place or with any particular person, he is usually, if not universally, protected from any further responsibility, so long as he leaves it there, and is not a guarantor of the safety of the deposit; and the ownership and liability appear to be co-extensive.

*Statutes construed: State funds: County funds.* The statutes of this state and of the territory have generally distinguished between the state and county funds, providing specifically for the deposit or preservation of the former, and leaving the latter to be dealt with and accounted for differently.

*County treasurers: Debtors: Bailees: Absolute liability.* Under the provisions of our statutes county treasurers become responsible as debtors, at all events, and not as bailees merely, for the county funds that come into their hands; and their liability is absolute and not affected by unavoidable loss or accident.

*Officers: Bonds: Official duty.* An officer cannot reasonably be compelled to give a bond going beyond his official duties, as a condition of being allowed to hold his office, but the bond ought properly to be regarded as the measure of official duty.

*Legislative construction: County treasurers.* Although a legislative construction is not authority for the past, yet the act of 1874 (*Laws of 1874, Vol. 2, p. 8*), providing for the deposit of Wayne county funds, and forbidding their loan or deposit except under conditions specified, and postponing its operation until the next official term of the county treasurer, indicates what has been the general understanding on this subject.

*County funds: County treasurer: Depositary: Payment.* One who has borrowed county funds and repaid them to the treasurer cannot afterwards be held liable to the county for them; as the treasurer is the only legal custodian of county funds, no one can be required to do more than put them in his hands.

*County funds: Money had and received: Case: Bill in equity: Moneys dishonestly borrowed of treasurer.* If one who has with a dishonest understanding received money from a county treasurer knowing it to be county funds required to be officially accounted for and restored, can be made liable at all to the county therefor, it must be by an action on the case, or a bill in equity, and not an action for money had and received; and the action would be based then, not on the source or identity of the particular fund which had been used, but would depend rather upon the state of the accounts; and the wrong is much in the nature of a voluntary transfer of property in fraud of creditors.

PERLEY v. COUNTY OF MUSKEGON.

*County funds: Rights of the county: Treasurer's bond.* And it is questionable how far the county could be regarded as directly damnified, even in such case, if the treasurer's sureties are responsible, or damnified beyond the deficiency in their ability.

*Heard April 27, 28 and 29. Decided June 8.*

Error to Muskegon Circuit.

*Ashley Pond* and *C. I. Walker,* for plaintiffs in error.

*A. T. McReynolds, Eggleston & Kleinhans* and *D. Darwin Hughes,* for defendant in error.

CAMPBELL, J:

Plaintiffs in error, who are surviving partners of Perley, Palmer & Co. (consisting of themselves and Charles Merrill, deceased), are sued for moneys alleged to have been received by or used for that firm, belonging to the county of Muskegon. The action is under the common counts for money had and received, and items were given under a bill of particulars. The funds are claimed to have been furnished or used by Martin Perley, then county treasurer, out of county moneys in his hands. The case presents many separate questions of law and evidence, the most important of which relate to the legal position of the treasurer as financial officer of the county. There are also questions of partnership and agency, and of evidence. Martin Perley turned out to be a defaulter in office.

He became county treasurer on the 15th of January, 1869. The position of the various parties before and after that time was regarded as important on the trial, and was in some respects undisputed, and in others controverted. Before December 8, 1868, Martin Perley had been in partnership with the three other persons named, and had owned a mill with them in Laketon. On that day he sold out his interest in the mill to Jonas H. Perley, and the partnership was dissolved. When the firm of Perley, Palmer & Co. was formed does not very clearly appear. Their firm busi-

ness was not chiefly done in that part of the state. From December, 1868, to the latter part of February, 1869, the mill was not in use, and Martin Perley received a small sum for watching it. About the 22d of February, 1869, Martin Perley made an arrangement to rent the mill from the owners for 1869, and continued to run it as lessee under that and a new arrangement until he went out of office in June, 1872. At the time of the first arrangement Palmer and Merrill owned a considerable quantity of logs, known as the Little River logs, in which Jonas H. Perley had no concern. These logs Martin Perley agreed to saw for them. During the same year he states that he sawed some other logs for all of them, as well as for other parties. He acted as agent for them in selling their lumber during his tenancy, and the proceeds passed through his hands. During this period he was sometimes in advance, and sometimes they were in advance. The balance against him on the account kept in their name was quite large. During this same period dealings were had in the separate name of Jonas H. Perley, on which the balance was also fluctuating. On the close of the business, and allowing all the Jonas H. Perley account (as claimed by Martin Perley) to have been a partnership business, the balance seems to have been against Martin Perley.

In the course of his business dealings with these various parties Martin Perley kept all his money indiscriminately in the same bank accounts, including county moneys and the proceeds of business transactions. The deposits were drawn out and renewed, and paper was discounted from time to time by the bankers, and the proceeds deposited. In some cases the accounts were overdrawn and subsequently made good.

The suit is based on the claim that defendants are responsible for all county moneys which entered into these dealings, as moneys which came to their hands unlawfully; and that, although refunded to Martin Perley, such refunding does not discharge the obligation unless used for the county purposes, or in some way applied specifically as county money.

If the balance of accounts between Martin Perley and the firm in question was in their favor, it is evident they have reaped no profit, and have had no more in amount than was due them, and that Martin Perley has used up money for other purposes to the full extent of his defalcation; so that in refunding to the county they simply shift a debt from one creditor to another. The principal inquiry therefore relates to the nature of the county treasurer's powers and functions in dealing with the funds which have come to his possession.

The court below instructed the jury that the county treasurer stands on the footing of a bailee, and that moneys in his hands can never lose their character as a bailment so long as they can be traced; but remain county property throughout, whether deposited or remaining in the treasurer's hands, except when coming into the hands of persons having no knowledge of their origin. Upon the question of constructive knowedge charges were also given which need not be referred to in this immediate connection.

The position of a public officer is peculiar, and the differences in different systems of statutes show that the responsibility is not by any means uniform. There seems to be nothing at common law which distinguished public treasurers or depositaries from any other financial managers. Where the same person receives and pays out money, the identity of the particular money received must almost necessarily be changed constantly, and it must have been customary for a long time to place such funds in what may be supposed to be safer custody than private premises will always afford. The usual rule in regard to bailments exonerates the bailee who has done all that was in his power to prevent loss or accident, and there are authorities which on this ground discharge public treasurers from any greater liability. There are others which hold them to be debtors, and not bailees, and not exonerated under any circumstances.

It is well settled that in the case of all but special deposits, the money deposited becomes the property of the banker,

and he becomes the debtor of the depositor. No depositor can, upon refusal to pay a check, replevy or seize the funds in the bank. His redress must be as a creditor in some form of action to enforce his debt. Statutes sometimes give priority to peculiar debts, but except in such cases the depositor has no advantage over any other creditors.—*Com'l Bk. of Albany v. Hughes, 17 Wend., 94; Marine Bank v. Fulton Bank, 2 Wal. R., 252; Foster v. Essex Bank, 17 Mass. R., 479; Bank of Kentucky v. Wister, 2 Peters R., 318; Graves v. Dudley, 30 N. Y., 74; Matter of Franklin Bank, 1 Paige R., 249; Chapman v. White, 6 N. Y., 412; Downes v. Phœnix Bank, 6 Hill R., 297; Swartwout v. Mechanics' Bk., 5 Denio, 555.*

The deposit which creates these contract relations must be either the money of the officer or of the public, but it cannot usually be that of both. If an officer is required or authorized by law to make deposits in any particular place or with any particular person, he is usually, if not universally, protected from any further responsibility, so long as he leaves it there, and is not a guarantor of the safety of the deposit. The ownership and liability appear to be co-extensive. In *Swartwout v. Mechanics' Bank, 5 Denio, 555,* this question came up and was carefully discussed. Swartwout, while collector of New York city, deposited money with the defendant bank in his official name, while he had a separate account in his individual name at the same time. Some time after his removal he signed a check for the balance, by the name of Samuel Swartwout, *late collector,* which the bank refused to honor on the ground that the money belonged to the United States, and had been applied by the bank, which had been a government depositary, to balance their account with the government. The court held that it would not be sufficient to show this money had been officially received for the benefit of the United States, in order to entitle the government to the money. As the collector was not one of those officers who had been required by authority to deposit in these banks, it was like any other deposit, "lia-

ble to be drawn only by the depositor." The court use further this language: "The addition of 'collector,' in the keeping of the account, may have been, and probably was, to distinguish and keep separate the money he received in his official capacity from that which he received in his own individual capacity. But a deposit in this manner can hardly be deemed a payment over of the money in discharge of his official duty, or the execution of his trust. It is placed in deposit ready to be paid over upon his own draft, when called upon by the proper officer or authority. A deposit to the secretary of the treasury would have placed it beyond the control of the plaintiff; but a mere deposit by a collector in his own name, with his official addition, is no accounting for the money received by him in his official capacity. A county treasurer, sheriff, surrogate, or other such officer, opens an account with a bank with his addition, and keeps a separate account in such capacity; most clearly he can collect such deposits in his own name, and the bank would not be permitted to show that the money belonged to the county, etc. The same rule and principle apply to the present case."

The same principle was applied in *Sims v. Brittain, 4 B. & Ad., 375,* where money had been deposited with an agent in the name of one Gribble in a separate account as managing owner of a ship, he keeping a separate private account. After his death it was held no suit could be brought for this money except by his executors, and that the other owners could not claim it. The court liken it to a bank deposit, and say it was a loan to the agent by Gribble alone, and not enuring to any one else.

The same principle is illustrated by the course of United States decisions on official liability. In *Elliott v. Swartwout, 10 Peters, 137,* and *Bend v. Hoyt, 13 Peters, 263,* it was held assumpsit would lie against a collector for money received by him in excess of duties, if paid under protest. An act was then passed requiring collectors when money was paid under protest not to retain it, but to place it to the

credit of the treasurer of the United States, and provision was made for refunding out of the treasury. In *Cary v. Curtis, 3 How. R., 236,* it was held that this change in the law exonerated collectors from liability in assumpsit for such moneys, whether the collector had paid it to the United States or not, since it was recoverable from him by the United States, and there could be no double liability in assumpsit for the same money.

In *U. S. v. Buford, 3 Peters, 12,* one Morrison, a *deputy quartermaster general,* had paid to Buford, who was a deputy commissary, ten thousand dollars of government funds without legal authority. The payment was unauthorized and disallowed. An act of congress authorized a settlement, and credit to Morrison, on his assigning his claim against Buford. This was done, and in a suit against Buford by the United States, it was held the government had no better right than Morrison, and was barred by the same statute of limitations which would have applied to him as assignor. And in *Miltenberger v. Cook, 18 Wal., 421,* where a collector of internal revenue had taken drafts instead of money for public dues, to avoid the risk of robbery in a dangerous district, it was held he could collect the securities in his own name. The statutes of the United States are too explicit to leave any doubt concerning the duties and responsibilities of officers dealing with public funds, and in providing where and how such moneys shall be kept. But in the only case where officers are allowed to choose their banks of deposit, they are required to do so at their own risk.—*U. S. Rev. Stat.,* § *3847.*

The statutes of this state and of the territory have generally distinguished between the state and county funds, providing specifically for the deposit or preservation of the former, and leaving the latter to be dealt with and accounted for differently. In 1829 the territorial treasurer was required to keep a bank-book showing receipts and moneys drawn, and no money could be checked out except by checks countersigned by the auditor, and all moneys were to be deposited

within three days after receipt, and such deposit exonerated the sureties.—2 Terr. L., 743.

The legislation since the state was organized has in like manner recognized bank deposits of state money, and has frequently regulated the subject.—See Laws of 1835-6, pp. 8, 9, 43, 61, 62, 63, 148; R. S. of 1838, pp. 29, 90, 98; Laws of 1839, pp. 58, 120; Laws of 1853, pp.. 71, 88; Laws of 1855, p. 238; Laws of 1861, pp. 150, 583; Laws of 1863, p. 351. It is contemplated that all state funds shall remain specifically, either in the state treasurer's office, or as deposits in bank, so that they can be counted monthly.—Laws of 1861, p. 31. And on the vacancy of the office by resignation, limitation or death the moneys, as well as other property in the treasury, are to be taken possession of specifically by the state officers.—C. L. 1871, p. 160. There is no state money the title to which passes to the treasurer individually. His whole dealing with it is official and specific.

In the case of county treasurers there has never been any law authorizing or requiring them to make deposits or protecting such deposits, except as to state funds, by R. S. of 1838, pp. 90, 98. And there is no law authorizing any one but the treasurer to handle, or to intermeddle with the funds, but only to investigate the accounts. If he accounts fairly, and meets all obligations as presented, there can usually be no occasion to inquire further, and no such duty has been imposed of counting, as is required for state moneys. In regard to county funds the treasurers are responsible as debtors, and in case of vacancy the moneys belonging to the treasury are not to be taken possession of specifically, but are to be delivered over on oath, by the previous officer, if alive, and in case of his death, by his personal representatives.—C. L. 1871, § 518. There is no principle which would allow private persons to meddle with county records or county funds in county possession. It can only be on the theory that the treasurer is a debtor, at all events, for the money received by him, and that the title vests in him per-

sonally, that his representatives can have any thing to do with the funds. Accordingly his liability is absolute, and not affected by unavoidable loss or accident, which, in case of bailments, could not fail to release him, without injustice.

Where the law has authorized or required a collecting officer to receive any thing but money, it has been held that as to such receipts he was only liable for what he specifically received.—*Montgomery v. Governor, 7 How. (Miss.), 68; Peck, Trustee v. James, Trustee, 3 Head, 75;* and it was held in *U. S. v. Morgan, 11 How. R., 154,* that where an officer had lawfully received and cancelled treasury notes which were afterwards lost by his servant on the way to the postoffice, he was only liable for the loss and inconvenience arising from their not being returned to the treasury, and not for their amount in money. But where, without such authority of law, he receives something else in lieu of money, he must account for it as money.—*Coxe, N. J., 242.*

There has no doubt been some conflict as to this liability and its grounds. In *Supervisors of Albany v. Dorr, 25 Wend., 440,* where the officer's bond was in substance the same as here, it was held a county treasurer was not liable where the identical moneys he had received were stolen without his fault. This was affirmed in *7 Hill, 583,* by a divided court, the chancellor voting for affirmance. The next year, in *Muzzy v. Shattuck, 1 Denio, 233,* a town collector was held, under precisely similar circumstances, liable as a debtor. No attempt was made to overrule the former case, which was referred to, but the statutory duties were held broad enough to compel the liability. This case was also affirmed on error, but no opinion published.—See note to *7 Hill, 584.* In some cases the liability has been based on the terms of the official bond, which is supposed to have enlarged his liability, and made it rest on contract.—*U. S. v. Prescott, 3 How. R., 578,* followed in *U. S. v. Dashiel, 4 Wal., 182,* and *U. S. v. Keehler, 9 Wal., 83.* In this latter case, however, the court lay stress on the fact that the defendant had paid over United States funds to the con-

federate authorities without any proof of coercion, and refer to the acts of congress relieving parties who have been deprived of funds by force. In *Boyden v. U. S., 13 Wal., 17*, where the bond was merely to perform the trust faithfully, the same absolute liability was enforced against a receiver who had been robbed by violence. In *Bevans v. U. S., 13 Wal., 56*, the receiver, if he had done his duty, would have paid over the funds in his hands before the war, and was in actual default, and the court expressly reserve an opinion as to his liability if he had been innocent. The same is true of *Halliburton v. U. S., 13 Wal., 63*. In *Commonwealth v. Comly, 3 Penn. St., 372*, and *State v. Harper, 6 Ohio St., 607*, the liability is rested on contract.

It is to be remarked that the United States statutes have usually required the identical money received to be kept and paid over, so as to create a bailment in the strict sense of the term, and the decisions have recognized the holder as a bailee, but with liability increased by contract. The cases decided are not, as it is seen, entirely consistent. It is difficult to see how an officer can be compelled to give a bond going beyond his official duties, as a condition of being allowed to hold his office. Where an office is purely of legislative creation, of course it can be subjected to any conditions deemed proper. But it seems more reasonable to construe all the statutes together, and to make the bond the measure of official duty, instead of making it an independent contract. Most of the decisions in regard to local treasurers have done this. We have found no decisions in other states upon the liability of state treasurers, but our own statutes have distinguished them to some extent as suggested, and their duties are usually such as to require constant attention, whereas many of the local officers have very light official duties, and are differently situated as to banks and other instrumentalities of finance.

In *Colerain v. Bell, 9 Met., 499*, the question came up directly as to the character of funds in the hands of a collector. He had been collector for two separate years, 1840

and 1841, and had applied some collections of 1841 to cover up his deficiencies in 1840, and his sureties for 1841 insisted they were entitled to the benefit of these payments, and that the credit should be changed to 1841 by the town.    But the court held otherwise, and used this language: "Neither is it a case of misapplication of any specific funds which the collector was bound to pay to the treasurer of the town. The specific money received by a collector in the collection of taxes is his money, and not that of the town."    And in *Inhabitants of Hancock v. Hazzard, 12 Cush., 112,* the liability of a treasurer for stolen money was rested on the principle of *Colerain v. Bell,* that it was his own money, for which he had become a debtor, and liable at all events. This same principle has been recognized several times in Indiana, and the idea of bailment repudiated.—*Allen v. State, 6 Blackf., 252; Morbeck v. State, 28 Ind., 86; Halbert v. State, 22 Ind., 128; Rock v. Stinger, 36 Ind., 346; Steinback v. State, 38 Ind., 483;* in New Jersey, in *Board of Justices v. Fennimore, Coxe, 242,* and in Pennsylvania, in *Hayes, Treas. v. Grier, 4 Binney, 80.*

Some of these cases are very instructive.    In *Morbeck v. State,* it was shown that the town treasurer had the best safe in town, and the money stolen was kept separate, and a considerable amount of his own was stolen with it.    In *Halbert v. State,* the county commissioners had purchased a safe and ordered the county money to be kept in it, which was done, and the safe broken open and robbed.    It was held the treasurer was a debtor, and not a bailee, and could do with the money as he chose, and 'must bear the responsibility, and that their order was beyond their authority and would not avail him.    In *Rock v. Stinger,* the treasurer had loaned out county money on notes payable to him officially, and it was held they were his individual property, and not that of the county.    This case refers to the decisions, and discusses the relations of the officers very fully, and among other things recognizes the rule indicated by our statute as to the death of an officer, using these remarks: "Suppose a town-

ship trustee should die, with moneys received by him as such in his hands, can it be claimed that the money, even if the specific bills or coin received by him officially could be identified, would go to his successor, and not to his administrator? We think it quite clear, in the case supposed, that the money would go to the administrator, because simply the title was in the trustee. This view is fully sustained by authority," etc.

In *Steinback v. State, 38 Ind., 483,* the facts were in some respects like those at bar. A township trustee kept bank deposits in which he mixed his own and township funds, and overdrew his account, and paid township debts with the overdraft, for which he gave his official due-bill. But it was held the deposit account was a private matter in which neither the township nor the sureties on his bond had any concern, and on which they were not liable for what was drawn.

The relations of a treasurer to money in his hands are also considered in a similar way in *Inhabitants of New Providence v. McEachron, 4 Vroom, 339.*

Although a legislative construction is not authority for the past, yet the law of 1874, providing for the deposit of Wayne county funds, and forbidding their loan or deposit except under conditions specified, and postponing its operation until the next official term of the county treasurer, indicates what has been the general understanding on this subject.—*2 L. 1874, p. 8.*

If the moneys in bank were not throughout held under contract relations with the county itself, then it is impossible to see how an action would lie for money had and received, either against the bank primarily, or against those who received it from the bank. Neither can it be clear otherwise why the bank would not in every case of a check be bound to look to the purpose for which it was drawn. County funds, as such, cannot lawfully be drawn from the county treasury at the mere will of the treasurer. He must have county vouchers for them. But if money as soon as received by him is credited to the county, no second credit can be

needed, and whether the treasurer in his discretion keeps it in his own office or elsewhere, will not change the accounts. The treasurer receives money daily, not only from different sources, but for different purposes. Some of it is liable to deductions for his pay. Some belongs to the state, some to the town libraries, and other funds to other purposes. These cannot be distinguished in his hands so as to make one rather than another suffer for his defaults. Whether he deposits money, or spends it, or keeps it, and whether he loses it honestly or dishonestly, his liability is the same. He must account for the sums, and not the identical funds received, and must account for them at all events. There can be no middle ground between personal and official ownership of moneys.

If the moneys used by Martin Perley could be treated as specifically county funds, the liability of parties receiving them would be immediate, and would not depend upon his default. They might have been sued at any time, before as well as after his accounting; and that is the effect of the charges given. But in case his final default should exceed the amount received by one party, and not reach the sum of all his loans, it would at once raise a difficulty not easily disposed of. But in law there can be no difference between a loan to a banker and a loan to any one else. There is no rule of law which presumes one borrower without security as safer than another. And where, as here, the deposits were promiscuous and from all sources, it would be idle to attempt to attach contract relations with the county to funds which no ingenuity could identify.

There is not much difficulty in reaching the personal duty of the treasurer. He is bound to have money to pay liabilities as required, to the full extent of his receipts. And he is bound when his term ends to have the balance ready to turn over to his successor. He could not be liable to a civil action if he makes all the payments required by law to be made. He and his sureties are bound on their bond when any such failure occurs. And it appears to be reasonable that if he has with any dishonest understanding put

PERLEY *v.* COUNTY OF MUSKEGON.

money into the hands of others which has not been returned, and which it was known could not have come from any other source, and could only have been derived from his office, and must be officially accounted for and restored, those persons have done an injury for which they should be accountable to those whom they have injured. It may be questionable how far the county could be regarded as directly damnified, if the sureties are responsible, or damnified beyond the deficiency in their ability. But there can be no injury where all that is borrowed has been restored. In such a case as the one suggested the injury consists in destroying to a given extent his power to meet his obligations, and this cannot be done when he is placed again in his former position. As he is the only legal custodian of county funds, no one can be required to do more than put them in his hands. He has a right to demand them, and he can keep them where he pleases. He is himself, to all intents and purposes, the treasury, and bound to account for all that he receives, and no one else can supervise his action.

But an action based on any such theory must be an action on the case, or a bill in equity, and not an action for money had and received. It can never be determined in advance, when money is lent, how far the county will be injured, or that it will be injured at all. And the action is not based on the source or identity of the particular funds which have been used. It must depend more on the state of the accounts than upon the identity of the money, and the wrong is much in the nature of a voluntary transfer of property in fraud of creditors, whereby they will be delayed or hindered, and of which the county may justly complain if actually defrauded.

As we are of opinion that the action is improperly framed, we need not discuss the other questions.

The judgment must be reversed, with costs, and a new trial granted.

The other Justices concurred.