PEOPLE *v.* GLAZIER.

1. EMBEZZLEMENT—INDICTMENT—PUBLIC OFFICERS—STATING CONCLUSIONS.

An indictment against a State treasurer for embezzlement is sufficient which charges a statutory offense in the language of the statute without stating the evidence, although it alleges generally that the funds were unlawfully converted to the use of a bank of which he was the principal stockholder, where the idea of a lawful appropriation or deposit is negatived in the indictment.

2. SAME—PUBLIC OFFICERS—STATE TREASURER.

Under 1 Comp. Laws, § 1189 *et seq.*, the State treasurer is liable as a bailee for State funds in depositories selected according to law.

3. SAME.

It is unlawful for the State treasurer to deposit funds in a bank for any pecuniary inducement. 1 Comp. Laws, § 1201.

4. SAME—STATUTORY CONSTRUCTION.

The intent of a general statute to modify a special act being plain, the rule that a subsequent general statute will not be held to modify a special statute is inapplicable.

5. SAME—BANKS AND BANKING—STOCK AND STOCKHOLDERS—PUB-
LIC OFFICERS.

The fact that the inducement to the State treasurer to deposit
money in a bank of which he was a principal stockholder
consisted in the gain which he would indirectly receive, does
not affect his criminal liability under 1 Comp. Laws, § 1201.
*Board of Fire & Water Com'rs of Marquette* v. *Wilkinson,*
119 Mich. 655 (78 N. W. 893, 44 L. R. A. 493).

6. SAME—PLEADING—INDICTMENT AND INFORMATION.

The joinder in an indictment of several counts for the unlaw-
ful appropriation of different sums of money by the State
treasurer is not objectionable, and may be treated as a
specific statement of the successive acts constituting a single
offense under 3 Comp. Laws, § 11614.

7. SAME—PUBLIC OFFICERS—INTENT.

A public officer who devotes funds in his custody to any
other purposes than those which the law authorizes must
account for them to his successor or be guilty of a felony un-
der 1 Comp. Laws, § 1201, no matter how good his intentions
may have been.

8. SAME—EVIDENCE—DEPOSITS BY CHECKS AND DRAFTS.

The checks and drafts by means of which money was de-
posited by the treasurer were admissible in evidence to
show the unlawful appropriation of money charged in the
indictment.

9. SAME—EVIDENCE—IMMATERIALITY.

No prejudicial error results from the admission, in a prosecu-
tion for embezzlement, of testimony to show the respondent's
bad faith which was not a necessary element of the offense.

Exceptions before judgment from Ingham; Wiest, J.
Submitted November 16, 1909.   (Docket No. 83.)   De-
cided February 3, 1910.

Frank P. Glazier was convicted of embezzlement.
Affirmed.

*A. J. Sawyer & Son* (*L. B. McArthur,* of counsel),
for appellant.

*Walter S. Foster,* Prosecuting Attorney (*Charles W.
Nichols,* of counsel), for the people.

159 MICH.—34.

BLAIR, J.    Respondent was indicted upon presentment by a grand jury, charging him in 31 counts with violations of section 11612 of the Compiled Laws. All of the counts of the indictment are in the same form, except that some of them charge respondent, as State treasurer, with knowingly and unlawfully appropriating, at different times, to his own use, different sums belonging to the State, and in his custody as State treasurer. Certain counts charge the appropriations to be to the use of the Chelsea Savings Bank, while other counts allege an appropriation to the use of himself and the Chelsea Savings Bank jointly.

At the close of the testimony the prosecution elected to go to the jury upon the 10 counts, alleging, with proper variations of time and amount, as in the ninth count:

" That on, to wit, the day and year aforesaid, at, to wit, the city of Lansing, in the county of Ingham aforesaid, the said Frank P. Glazier, so holding the office of State treasurer as aforesaid, did knowingly, unlawfully, and feloniously appropriate to the use of the Chelsea Savings Bank, a body corporate under the laws of the State of Michigan, a large sum of money, to wit, the sum of $12,213.15, of the value of $50 and upwards, to wit, of the value of $12,213.15, the property of and belonging to the said State of Michigan, which had been received and was then held by him in his official capacity aforesaid as State treasurer of the State of Michigan, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the people of the State of Michigan."

During his entire term of office as State treasurer, from January 1, 1905, till January 20, 1908, when he resigned, respondent was president, director, principal stockholder, chairman of the discount committee, and active manager of the Chelsea Savings Bank of Chelsea, a village of some 2,000 inhabitants. The capital stock of the bank was increased from $60,000 to $100,000 on December 28, 1905. For many years prior to 1905 the bank had been a State depository of public funds. Soon after January 1, 1905, and again soon after January 1, 1907, respondent

entered into contracts with the bank, signed by himself as State treasurer, on the one hand, and as president of the bank, on the other hand, providing for the deposit of State moneys in said bank. In clause 2 of the contracts the bank agreed to reimburse and pay the respondent, as State treasurer, all such sums as might be deposited by him in said bank, "whenever called for," and to pay interest on daily balances, not to exceed 3 per cent. The interest actually paid was 1¾ per cent. The respondent also took from said bank various surety bonds aggregating $200,000, to secure performance of the contracts, such bonds being approved, as required by law, by the State treasurer, auditor general, and secretary of State. The bank was closed by the State banking department on December 2, 1907, at which time the balance of State moneys on deposit was $685,587.79, and the affairs of the bank passed into the hands of a receiver.

The remittances of the deposits were made by check or draft, except in the case of the $23,000 deposit of November 13, 1907, in which case $3,000 of such deposit was in currency. The checks or drafts were of two classes: One class being drawn upon various Detroit banks, and being in each instance signed by the deputy State treasurer, and the other class being miscellaneous checks or drafts drawn to the State treasurer or other State officers for taxes and other demands due the State, which found their way into the State treasury, and which were in turn indorsed over to the Chelsea Savings Bank. The former class were checks drawn by the deputy State treasurer upon other State depositories, while the latter class were mere private checks or drafts which had been received by the State and made payable to the Chelsea Savings Bank by indorsement. Since the receiver has had charge of the affairs of the Chelsea Savings Bank he has repaid to the State, upon account of the State funds deposited in the bank, two dividends, one on May 6, 1908, of $205,745.34, and another on October 21, 1908, of $70,879.77. There has also been paid to the

State by one of the bonding companies, upon the bond of the Chelsea Savings Bank as a State depository, the sum of $50,000. The affairs of the Chelsea Savings Bank were still in the hands of a receiver at the time of the trial.

The respondent was the owner of 668 of the shares of stock, or a little more than two-thirds of the entire capital stock of the bank, and thereby empowered to elect the entire directorate of the bank, and entitled to two-thirds of the profits of the business. He was also the president and principal owner of the Glazier Stove Company, an extensive manufacturing institution, and was interested in other business enterprises which necessitated the borrowing of large sums of money. The evidence demonstrates that he was not using the public moneys with sole reference to the public interests, but largely for the support of his banking business and in aid of the other institutions in which he was interested. Respondent was financially interested in the Ann Arbor News Publishing Company, the Blanchard Wool Company, and the Chelsea Grain & Produce Company. Through Martin J. Walkenhut, as agent, he was engaged in the business of buying wool on his own account. During 1906 and 1907 he practically rebuilt and greatly extended the stove plant, and constructed a large office building in Ann Arbor, costing, complete, about $165,000. He spent about $30,000 on the Blodgett Terrace in Detroit, and built an expensive cottage at Cavanaugh Lake, near Chelsea.

The board of directors of the bank took no action requesting the deposit of State moneys in the bank, and the cashier testified that he did not know how they came to be deposited. The deputy State treasurer testified that the deposits were made by direction of respondent, either verbally or over the telephone. On January 9, 1906, the following persons were elected directors, viz.: F. P. Glazier, William J. Knapp, William P. Schenck, V. D. Hindelang, J. W. Schenck, Fred Wedemeyer, Adam Eppler, H. I. Stimson, Theodore E. Wood. At a meet-

ing of the board of directors, April 9, 1906, the following occurred:

"Motion made that loans to the extent of 20 per cent. of capital and surplus be extended to the Chelsea Grain & Produce Company, Glazier Stove Company, and such other firms as the president thought best to extend loans. No further business; the meeting adjourned."

At the annual meeting of January 8, 1907, F. P. Glazier, William J. Knapp, William P. Schenck, Adam Eppler, H. I. Stimson, Theodore E. Wood, J. W. Schenck were elected directors. At the meeting of the board of directors, January 14, 1907, the following occurred:

"Motion made that loans to the extent of 20 per cent. of the capital and surplus be extended to the Glazier Stove Company, Chelsea Grain & Produce Company, and such other firms as the president thought best to loan to. Carried."

At the directors' meeting of April 15, 1907, the following occurred:

"A motion was made by director Knapp, supported by Director Stimson, that Mrs. Henrietta M. Glazier be extended loans to 20 per cent. of the capital and surplus. Carried unanimously. A motion was made by Director Knapp, and supported by Director J. W. Schenck, that Harold P. Glazier be extended loans to 20 per cent. of the capital and surplus. Carried unanimously. A motion was made by Director Stimson, and supported by Director J. W. Schenck, that Vera G. Glazier be extended loans to 20 per cent. of the capital and surplus. Carried unanimously. A motion was made by Director J. W. Knapp, and supported by Director Wood, that Saxe C. Stimson be extended loans to 20 per cent. of the capital and surplus. Carried unanimously. A motion was made by Director Wood, and supported by Director Stimson, that W. P. Schenck be extended loans to 20 per cent. of the capital and surplus. Carried unanimously. A motion was made by Director Knapp and supported by Director W. P. Schenck, that F. P. Glazier be extended loans to 20 per cent. of the capital and surplus. Carried unanimously."

At the directors' meeting of September 9, 1907, the following occurred:

"Motion by Director H. I. Stimson, supported by Director W. J. Knapp, that John W. Schenck be extended loans to 20 per cent. of the capital and surplus. Carried unanimously. Motion made by Director W. J. Knapp, supported by Director J. W. Schenck, that Emily J. Glazier be extended loans to 20 per cent. of the capital and surplus. Carried unanimously. Motion made by Director T. E. Wood, supported by Director H. I. Stimson, that Adelia A. Comstock be extended loans to 20 per cent. of capital stock and surplus. Carried unanimously."

During 1906 and 1907 the Chelsea Savings Bank loaned to the Glazier Stove Company $215,000. There was unpaid on these loans when the bank was closed a note of $100,000 secured by the stove company's stock. There was loaned to the Chelsea Grain & Produce Company $58,000, the notes being secured by warehouse receipts for wool, upon which had been collected, at the time of the trial, all but $8,000. There was loaned to Walkenhut, nominally, but really to respondent, $25,448.45. There was paid on these notes about $10,630.

The following is a list of loans made by the Chelsea Savings Bank during 1906 and 1907 on notes payable to said bank, and for which the respondent received the credit upon the books of said bank, and all of which were personally discounted by him:

| Date of Discount. | Maker. | Amount. |
|---|---|---|
| 1906. | | |
| April 5. | Ann Arbor News Pub. Co. | $18,000 |
| May 18. | Frank P. Glazier | 10,000 |
| June 7. | Frank P. Glazier | 5,000 |
| Aug. 13. | Frank P. Glazier | 20,000 |
| Aug. 29. | Frank P. Glazier | 5,000 |
| Sept. 20. | Frank P. Glazier | 5,000 |
| Oct. 16. | Frank P. Glazier | 5,000 |
| Dec. 15. | Frank P. Glazier | 5,000 |
| 1907. | | |
| Feb. 21. | Frank P. Glazier | 20,000 |

| Date of Discount. 1907. | Maker. | Amount. |
|---|---|---|
| May 21. | Frank P. Glazier | 80,000 |
| June 22. | Frank P. Glazier | 5,000 |
| Oct. 26. | Frank P. Glazier | 100,000 |
| July 18. | Frank P. Glazier | 5,000 |
| Sept. 5. | Frank P. Glazier | 5,000 |
| April 19. | Henrietta M. Glazier | 30,000 |
| April 19. | Vera G. Glazier | 28,000 |
| April 19. | Harold P. Glazier | 28,000 |
| April 19. | Saxe C. Stimson | 35,000 |
| May 13. | H. I. Stimson | 5,000 |
| June 1. | W. P. Schenck | 20,000 |
| Sept. 19. | W. P. Schenck | 15,000 |
| Nov. 18. | W. P. Schenck | 5,000 |
| June 26. | John W. Schenck | 15,000 |
| Sept. 16. | John W. Schenck | 10,000 |
| Oct. 2. | John W. Schenck | 10,000 |
| Nov. 18. | John W. Schenck | 5,000 |
| May 2. | Anna P. Tichenor | 5,000 |
| Total | | $499,000 |

All of the notes given by respondent were paid during 1906 and 1907, except the two notes of $80,000 and $100,000, respectively. There was paid upon the Henrietta M. Glazier, Vera G. Glazier, and Harold P. Glazier notes the sum of $30,000. None of the other notes were paid, either in full or in part. The only notes secured by mortgage or collateral were the two notes of respondent for $80,000 and $100,000, respectively. The only note which bore the name of an indorser was that of Harold P. Glazier. All of these notes, except the respondent's, which were paid, and the Ann Arbor News Company, were given for either three or five years. The mortgages securing the loans of respondent above mentioned were not recorded until after the bank had closed its doors. Neither of these mortgages was approved by the board of directors until November 25, 1907. All of these notes were considered by the cashier, Mr. Wood, as they in fact were, the obligations of respondent. The note and mort-

gage of $100,000 were dated July 15, 1907, but were not entered on the bank's records until October 26, 1907. The grand total of loans made by respondent and the few institutions in which he was financially interested, during the years 1906 and 1907, was $880,573.42. Of this there remained unpaid when the doors of the bank were closed, including the $20,000 loan of respondent in 1905, the sum of $527,317.49. Henrietta Glazier is respondent's wife; Harold and Vera Glazier, respectively, his son and daughter.

In the treasury department accounts with depositories are classified as "active" where the accounts are constantly fluctuating by deposits and withdrawals, and "nonactive" where the treasurer only checks against them to a limited extent. The Chelsea Savings Bank's account was classed as active, although the record does not disclose that the treasurer drew a check against it during 1906 and 1907. During 1907, for the greater portion of the time, there was a deficit in the bank's legal reserve fund, which was taken care of, from time to time, by deposits of State funds. It appears to us to be a necessary conclusion from the evidence in the record that respondent completely dominated and controlled this bank, and that the board of directors, when it acted, merely registered his will.

At the conclusion of the proofs submitted on the part of the people, counsel for respondent moved the court to direct a verdict of not guilty, and also moved the court to discharge the respondent because of the insufficiency of the indictment. These motions were overruled by the trial judge, whereupon the respondent rested his case without offering any proof. The case is brought to this court upon exceptions before sentence.

The errors relied upon by counsel for respondent have been classified by them in their brief, and we consider them in their order.

1. Insufficiency of the Indictment. The substance of

the contention that the indictment was insufficient is, as stated in the brief:

"That the indictment does not set forth the facts which make the appropriation of the money of the State to the use of the Chelsea Savings Bank unlawful, but that the indictment charges only a conclusion drawn by the pleader from undisclosed facts, and that the indictment is insufficient and in violation of respondent's constitutional privilege to be informed of the nature of the accusation against him."

It is generally sufficient to charge a statutory offense in the language of the statute, and to state the crime charged, and not the evidence thereof. The principal, if not the only, exceptions to this rule are where the statutory definition of the offense does not include all of its elements, or "where the words of the statute may by their generality embrace cases which, while falling within its literal terms, are not within its meaning or spirit." *People* v. *Taylor*, 96 Mich. 576 (56 N. W. 27, 21 L. R. A. 287); *People* v. *Butler*, 122 Mich. 35 (80 N. W. 883).

It is conceded by respondent's counsel, that an information under this statute, alleging an unlawful appropriation to his own use, or to the use of anybody else except an incorporated bank, would be valid, the reason stated for such concession being that such alleged appropriations would appear to be illegal on their face, while an allegation of an unlawful appropriation to a bank would appear upon its face to be an averment of doing a lawful act unlawfully, and, consequently, it must be averred wherein the unlawfulness consists. We do not think that this statute can be split up into fragments; it must be construed as a whole. It being conceded, and we think properly, that it states the elements of the offense of unlawful appropriations generally, and the section not making any exceptions in terms, it must be held to cover any unlawful appropriation for which a conviction may be had under the statute and to justify an information describing the offense in the language of the statute. The language of

the statute as used in the information excludes the idea of a lawful appropriation or deposit; and, unless it is to be held that there can be no unlawful appropriation of money under this statute to a State bank under any circumstances, the nature of the unlawful act is a matter of proof which need not be averred in the information.

2. Sufficiency of the Proofs. In determining whether the proofs support the verdict of the jury, it becomes necessary to determine at the outset an important question of law raised by respondent's contention that section 1201, 1 Comp. Laws, does not apply to his deposits in the Chelsea Savings Bank. Upon this question the trial judge instructed the jury as follows:

"The purpose or intent of respondent in what he did may be gathered from what was done by him, provided the inference showing such intent clearly appears, and it is not reasonable to give his acts any other purpose than a criminal purpose. Unless one expresses his purpose or intention in doing an act, he leaves the same to be determined from what he does. So in this case you may consider the evidence of what the respondent as State treasurer did with the funds of the State so far as his acts with the same relate to their deposit in and use by the Chelsea Savings Bank. And from all of his acts and doings about the same, so far as disclosed by the evidence, you are to determine whether his purpose was to give the bank the use of the same, and thereby as a stockholder bring to himself a pecuniary advantage. If such was his purpose, it was criminal.

"Whether he received such pecuniary return from their use or not, it was unlawful for him to give to a bank in which he was a stockholder the use of State funds in his hands as State treasurer, and if he sent, or caused such funds to be sent, to such bank through the hope and expectation of the bank profiting out of the use it could make of them, and thereby bring a pecuniary advantage to himself, he did an unlawful thing, and such unlawful purpose and unlawful and knowing appropriation of State funds would make out the offense charged against him.
*   *   *

"Neither is it necessary that you find the bank made any profit out of such funds, if any were so deposited.

The law prohibited him from applying the funds of the State, coming to him in his official capacity as State treasurer, to any other purposes than the legal ones for which such funds came to him, and this made it unlawful for him to apply such funds to the use of the Chelsea Savings Bank, if he did so, if he was a stockholder therein; and, if he was a stockholder therein and a director and a president thereof when he made such deposits of State funds therein, and was led to do so that the Chelsea Savings Bank have the use of such funds, and he as a stockholder therein hoped to gain a pecuniary advantage from their use by the bank, or intended as a stockholder, director, and president of such bank to manage such funds to his pecuniary advantage, or to the pecuniary advantage of the bank, then their deposit was not only unlawful, but knowingly made and with felonious intent.

"The unlawful appropriation of public money by the State treasurer to the use of another is not condoned by the fact, if it is a fact, that security was taken for its return, or it was believed it would be paid back upon demand. The unlawful appropriation takes place, if at all, when the State treasurer sets apart or diverts the money to an unlawful use. Even though he believed the money would be returned, yet the offense is complete upon an unlawful appropriation, knowingly made and with a felonious intent."

The argument of respondent's counsel, briefly stated, is:

(*a*) Act No. 105, Laws 1855 (sections 1189, 1190, 1 Comp. Laws), is a special statute, conferring upon the State treasurer, auditor general and secretary of State the power to create a State depository, and placing upon the State treasurer the duty to deposit in such depositories the surplus funds of the State. Act No. 131, Pub. Acts 1875, "to provide for the safe keeping of public moneys" (sections 1197–1204), is a general statute, and "in such a case the general statute must give way to the special prior statute." If section 1201 applies to State depositories created in pursuance of the statutory formalities, "then the two statutes are in conflict, or at least cover the same matters; and, under the rule just quoted, the subsequent general statute must be held not to apply to the matters covered by the special statute."

(*b*) The Chelsea Savings Bank is to be treated as *a distinct legal entity*, and respondent could not offend "either the spirit or letter of the law by making deposits in such a bank, as in legal contemplation the Chelsea Savings Bank was a person entirely foreign to himself. He could have been guilty of *receiving an inducement* for making such deposits, but this is an entirely different question."

(*c*) Penal statutes must be construed strictly, and cannot be extended by implication; and, so construed, section 1201 must be limited to a direct bribe or promise preceding the deposit of public money. The act of receiving the inducement is entirely distinct from the act of making the deposit.

*a.* Section 78 1 Comp. Laws, requires of the State treasurer a bond conditioned that—

"The said treasurer shall use all necessary and reasonable diligence and care in the safe keeping and lawful disposal of all sums of money * * * which have or shall come to his hands or to the hands of any person or persons employed by him; and that the said treasurer shall, upon reasonable notice, render a true account in the premises whenever * * * and shall deliver over to his successor in said office, or to any other person authorized by law to receive the same, all moneys, books, bonds, notes, papers and all other things belonging to said office; and that all balances which shall appear against him, shall be forthwith paid into the treasury of the State."

In *Perley* v. *County of Muskegon*, 32 Mich. 138 (20 Am. Rep. 637), Mr. Justice CAMPBELL, reading for the court, said, *arguendo:*

"The statutes of this State and of the Territory have generally distinguished between the State and county funds, providing specifically for the deposit or preservation of the former, and leaving the latter to be dealt with and accounted for differently. In 1829 the Territorial treasurer was required to keep a bank book showing receipts and moneys drawn, and no money could be checked out except by checks countersigned by the auditor, and all moneys were to be deposited within three days after re-

ceipt, and such deposit exonerated the sureties.  2 Terr.
Laws, p. 743.   The legislation since the State was organ-
ized has in like manner recognized bank deposits of State
money, and has frequently regulated the subject.   See
Laws 1835–36, pp. 8, 9, 43, 61, 62, 63, 148; Rev. Stat.
1838, pp. 29, 90, 98; Laws 1839, pp. 58, 120; Laws 1853,
pp. 71, 88; Laws 1855, p. 238; Laws 1861, pp. 150, 583;
Laws 1863, p. 351.   It is contemplated that all State funds
shall remain specifically, either in the State treasurer's office,
or as deposits in bank, so that they can be counted monthly.
Laws 1861, p. 31.   And on the vacancy of the office by
resignation, limitation, or death, the moneys, as well as
other property in the treasury, are to be taken possession
of specifically by the State officers.   1 Comp. Laws 1871,
p. 160.   There is no State money the title to which passes
to the treasurer individually.   His whole dealing with it
is official and specific.   *   *   *

" We have found no decisions in other States upon the
liability of State treasurers, but our own statutes have
distinguished them to some extent as suggested, and their
duties are usually such as to require constant attention,
whereas many of the local officers have very light official
duties, and are differently situated as to banks and other
instrumentalities of finance."

The question whether the liability of the State treasurer
for the moneys of the State was that of a bailee or of a
debtor or insurer was not involved in that case, but the
inference to be deduced from the language quoted is that,
in his opinion, the liability of the State treasurer was that
of a bailee.   We agree that the liability of the State treas-
urer under his bond is not that of an insurer, and that the
measure of his obligation is the use of "all necessary and
reasonable diligence and care in the safe keeping and law-
ful disposal of all sums of money," etc.   It does not fol-
low, however, that the treasurer has fully discharged his
obligation by the use of such diligence and care in the se-
lection of a depository and the requiring of good and am-
ple security for the safe keeping of the funds of the State.
On the contrary, we are of the opinion that the duty to
exercise all necessary and reasonable diligence and care
to safeguard the funds of the State remains with the State

treasurer after the selection of the depository and receiving ample security. This results from the provisions of the statute itself authorizing the creation of State depositories. This statute contains two effective sections; the first two having become ineffective. Section 3 (1 Comp. Laws, § 1189) provides as follows:

" The State treasurer is hereby further instructed to require of any bank, before he shall have made it a depository of surplus funds belonging to the State, good and ample security, to be approved by the said State treasurer, the auditor general and the secretary of State, for the safe keeping and reimbursement of such surplus funds, whenever called for, and the payment of such rate of interest as the State treasurer, in his discretion, shall deem best for the interest of the State."

Section 4 (1 Comp. Laws, § 1190) reads:

" Nothing herein contained shall be held or considered as in any manner changing or affecting the liability of the State treasurer or his bail, or his or their bond to the State."

It is clear that, under this section 4, the liability of the treasurer upon his bond remains unchanged, and is to be considered as though the statute relative to depositories had never been passed. In the eye of the law the funds in the State depositories are still in the treasury of the State, and subject to the control of the treasurer. *People* v. *McKinney*, 10 Mich. 54. The auditor general and secretary of State have no voice in the selection of the depository; their action is limited to determining whether the bond required of the bank by the State treasurer is good and ample security before " he [the State treasurer] shall have made it a depository," etc. The length of time the money shall remain in the depository and the rate of interest to be paid are alike subject to the uncontrolled discretion of the treasurer. Under the statute, and by the terms of the contract, the bank is bound to return the State's money "whenever called for," and the treasurer may check out the fund at pleasure. If it were the fact

that the law conferred upon the State treasurer, auditor general, and secretary of State the power to create a single State depository, and made it the duty of the treasurer to deposit the State's surplus funds 'therein, there might be force in respondent's argument, but such is not the case. The depositories are selected by the treasurer, and he may select any number of such depositories.

"He may place a portion of the funds in bank in such place as in his opinion the public interest or the convenience of disbursement may require." *People* v. *McKinney,* 10 Mich. 87.

Furthermore, there is no duty resting upon the treasurer to create any depositories at all, or to deposit any funds in them after creating them. He may keep all of the funds within the treasury proper, if he so desires. If the State treasurer's deposits in banks from which he had received pecuniary inducements were lawful deposits therein prior to the act of 1875, which we are far from conceding, we have no doubt that it was the purpose of that act to modify and limit his right to make such deposits to banks from which he had received no pecuniary inducements. Section 1 of the act (1 Comp. Laws, § 1197) provides:

"*The People of the State of Michigan enact,* That all moneys which shall come into the hands of any officer of the State, or of any officer of any county, or of any township, school district, highway district, city or village, or of any other municipal or public corporation within this State, pursuant to any provision of law authorizing such officer to receive the same, shall be denominated public moneys within the meaning of this act."

Section 5 (1 Comp. Laws, § 1201) reads:

"In no case shall any such officer, directly or indirectly, receive any pecuniary or valuable consideration as an inducement for the deposit of any public moneys with any particular bank, person, firm or corporation."

The treasurer is the principal "officer of the State" receiving public moneys, and it was clearly the intention of

section 5 to prohibit him from depositing such moneys with *any particular bank* for a pecuniary inducement. The intent of the general statute to modify the special statute being clear, the rule of construction relied upon does not apply. *Regents of University of Michigan* v. *Auditor General*, 109 Mich. 134 (66 N. W. 956).

*b.* The fact that the inducement to respondent consisted of the gain which he would indirectly receive through his interest as a stockholder, and not through the direct action of the legal entity, is not material, since the statute provides for such indirect inducements.

*c.* The decision of this court in *Board of Fire & Water Com'rs of Marquette* v. *Wilkinson*, 119 Mich. 665 (78 N. W. 893, 44 L. R. A. 493), disposes of this point, as we think in principle it disposes of all other questions raised as to the applicability of section 1201 to this case.

3. Joinder of Counts.

"As relates to the time of the commission of such offenses, the indictment in this case places the respondent on trial for 28 separate and distinct offenses, requiring in each case proof of entirely distinct transactions. The several amounts charged to have been appropriated have no relation to each other, and the several counts were drawn for the express purpose of charging 28 different crimes committed on as many different days, covering a period of nearly two years. The offenses covered by the indictment could have been returned in 28 separate indictments instead of 1."

We consider this point to be disposed of by the case of *People* v. *McKinney*, 10 Mich. 54. If we have correctly interpreted the law, it was unlawful for respondent to deposit any of the State's money in the Chelsea Savings Bank, and his deposits therein may properly be considered as a continuing series of unlawful acts all flowing from the one preconceived design to use the State's money for the benefit of himself, his institutions, and his bank. This construction receives support from the language of section 3 of the act (3 Comp. Laws, § 11614), viz.:

"A failure or refusal of any public officer to pay over and deliver to his successor all moneys and property which should be in his hands as such officer shall be *prima facie* evidence of an offense against the provisions of section 1 of this act."

It will be noted that the failure *" to pay over  *  *  * all moneys and property which should be in his hands"* is made *prima facie* evidence of the offense. It must therefore be proper to allege and prove the total of the sums deposited and converted. In our opinion the technically proper form of the information in this regard would be as in the case of *People* v. *Seeley,* 117 Mich. 263, *vide* page 264 (75 N. W. 609). But this being so, there can be no legitimate objection to alleging the conversion of the items making up the total in separate counts serving really as a bill of particulars.

In *People* v. *McKinney, supra,* the State treasurer, by arrangement, drew at the same time six drafts upon the receiver of a railway company for portions of the specific tax due from the company; the drafts being payable at different dates, and their sum total being the amount of the tax. The drafts were accepted, and were paid as they fell due. After the acceptance of the drafts, they were indorsed by the State treasurer, discounted at a New York bank, and the amount thereof placed to his credit as State treasurer in said bank.. The information counted in separate counts upon the embezzlement of the respective amounts of the several drafts as they were paid. In discussing this information, the court said:

"And therefore, where the several offenses charged, though distinct in point of law, yet spring out of substantially the same transaction, or are so connected in their facts as to make substantially parts of the same transaction or connected series of facts, the defendant cannot be prejudiced in his defense by the joinder, and the court will neither quash nor compel an election." *Vide* pp. 94, 95.

See, also, *People* v. *Elmer,* 109 Mich. 493 (67 N. W. 550).

159 Mich.—35.

4. Knowledge as an Element of the Offense. In our opinion the adverb "knowingly" used in the statute was intended to exclude from the definition of the offense mistakes of fact, accidents, such as the loss of the money by fire or other casualty, or inadvertent appropriations. *McGuire* v. *State*, 7 Humph. (Tenn.) 54. The principal elements of the offense are:

(1) The receipt of public moneys by a public official entitled to receive them.

(2) The appropriation of the moneys, knowing them to be public moneys, to a use which, as a matter of law, is unauthorized.

(3) The failure or refusal to pay over the money, which he ought to have on hand.

The provisions of section 11614, 3 Comp. Laws, plainly imply that a felonious intent is not an element of the crime. In our opinion it was the intention of the legislature to provide that any public officer, who devoted the public funds in his custody and control to any other purposes than those to which the law authorized their appropriation, must account for them to his successor, or be guilty of a felony, no matter how good his intentions may have been. *People* v. *Warren*, 122 Mich. 504 (81 N. W. 360, 80 Am. St. Rep. 582). Under this statute the public officer uses the public funds for an unauthorized purpose at his peril. If he is able to account for them at the proper time, he incurs no criminal responsibility under this statute, however bad his motives, but can only be prosecuted for the offense described in section 1201, or under the general embezzlement statute. If he is unable to account, he is criminally responsible, however good his motives.

5. Admissibility of Checks and Drafts Under Allegations of Indictment Charging Appropriation of Money. The method pursued in making the deposits, as a general rule, was for the deputy State treasurer to draw a check, on some bank where the State had a deposit, payable to the Chelsea Savings Bank, by which bank it was indorsed

over to some bank in Detroit where it had an account; the Detroit bank being charged with the amount of the remittance. This account was then checked against by the Chelsea Savings Bank. The checks were merely the means through which the money was appropriated to the bank, and were so treated by the bank. The money was appropriated to the bank as much as though the currency had been sent there, and it was the duty of the bank to account for the money, which it should have had on hand. Moreover the point is within the principle of *People* v. *McKinney, supra.*

6. Errors in Admitting and Rejecting Evidence. The errors referred to, for the most part, relate to the rejection of testimony offered as tending to show the good faith of respondent. As we have held that the good faith of respondent was wholly immaterial, there was no error committed in this regard. Under the view we have taken of the law, it is true, as claimed by counsel for respondent, that respondent's unofficial transactions with the bank were immaterial, but under their construction of the law they were material. All that was necessary for the people to prove was the unlawful deposit of the money and the failure to account for it. These facts were conclusively proved by the undisputed evidence, and the admission of the testimony complained of was without prejudice.

The other errors argued in the briefs which merit consideration are disposed of by what we have already said in this opinion, and do not require separate consideration.

The exceptions are overruled, and the record remanded for further proceedings in accordance with the law.

Ostrander, Hooker, McAlvay, and Brooke, JJ., concurred.