| | |
|---|---|
| 103 | 109 |
| 104 | 66 |
| 103 | 109 |
| 107 | 193 |
| 107 | 194 |
| 107 | 342 |
| 103 | 109 |
| 116 | 283 |
| 103 | 109 |
| 119 | 420 |
| 119 | 669 |
| 103 | 109 |
| s61NW | 352 |
| 130 | ¹509 |
| 103 | 109 |
| s61NW | 352 |
| 131 | ¹324 |

THEODORE C. SHERWOOD, COMMISSIONER OF THE BANK-
ING DEPARTMENT OF THE STATE OF MICHIGAN,
v. THE CENTRAL MICHIGAN SAVINGS
BANK. IN THE MATTER OF THE
PETITION OF DANIEL B.
JOHNSON.

*Banks and banking—Special deposit—Trust—Following fund—
Insolvency—Waiver.*

1. Two mortgages belonging to a depositor were paid to his bank, with which he had left them for collection, and, in violation of his instructions, the money was, after being credited for a time to a fictitious account, passed to his credit. And it is held:

*a*—That the bank acted in the matter as agent for the depositor, and that the relation of debtor and creditor did not exist as to such collection.

*b*—That, if the bank took the responsibility of receiving checks in payment of the mortgages, the checks belonged to the depositor, if he chose to receive them, and it was the duty of the bank to use due diligence in collecting the money on the checks, and, when paid, such money became the property of the depositor.

*c*—That if the money became mingled with the bank funds by the act of its officers, as between the depositor and the bank, the former had a lien upon the whole fund, and the court will not be overtechnical or zealous in seeking an opportunity to say that the money cannot be traced, or has disappeared from the fund altogether, where there is evidence from which the contrary may be legitimately inferred.

*d*—That the receiver of the bank, which closed its doors on the day the money was credited to the depositor, took the assets of the bank charged with the legal and equitable obligations previously resting upon the bank, so far as its interests are concerned; that whatever, if any, modifications there may be of the right of the depositor to a lien upon the fund must result from the rights of general creditors, and the favorable disposition of the law towards an equal distribution of insolvent estates, as evidenced by the legislation upon the subject; citing *Stone v. Dodge*, 96 Mich. 521.

*e*—That, as the evidence discloses that the fund on hand showed a balance in excess of the amount of the trust fund each day from the receipt of the money until the doors of the bank were closed, there is no reason for indulging in a presumption that at some time during those days the fund was lower, especially as such fact, if true, would be demonstrable from the books of the bank.

*f*—That it is unnecessary, under the modern authorities, to find that the fund which came into the hands of the receiver included the identical money received by the bank, where, as in this case, it appears that the money treated as a trust fund was a component part of the money in the hands of the bank.

2. Shortly before, and on the same day, that the bank closed its doors, a representative of the depositor called for the money, and was at first informed by the cashier of the bank that he could not pay it, but the cashier finally paid a portion of the same, and gave a draft for the remainder, which was never paid. And it is held that, as the draft was received in reliance upon the false representations that the bank could not pay the money collected, it cannot be said that the depositor waived his right to claim the fund.

Appeal from Ingham. (Person, J.) Argued November 2, 1894. Decided December 18, 1894.

Petition to require the receiver of the Central Michigan Savings Bank to pay to Daniel B. Johnson certain funds claimed to have come into the hands of the bank as agent before the failure. The receiver appeals. Decree affirmed. The facts are stated in the opinion.

*Cahill & Ostrander,* for petitioner.

*M. V. & R. A. Montgomery,* for the receiver.

HOOKER, J. The Central Michigan Savings Bank of Lansing closed its doors and went into the hands of the Commissioner of Banking on April 18, 1893, being insolvent. Subsequently, on a bill filed in the circuit court for the county of Ingham by the bank commissioner, George W. Stone was appointed receiver, and took possession of the

property of the bank.　On May 19, 1893, Daniel B. Johnson filed his petition in said cause, asking that the receiver be required to pay over to him the sum of $7,206.96, which he claimed that said bank held in trust for him, to the exclusion of the claims of other creditors.　An answer was filed, and upon the hearing, upon proofs taken in open court, a decree in accordance with the prayer of the petition for $5,581.96 was made, from which the receiver appealed.

The testimony shows that Johnson was a depositor in said bank, and that he was the owner of two real-estate mortgages, upon which there was due upon April 14, 1893, about $10,581.96.　Johnson died before the hearing.　His son, Frank Johnson, testified that the mortgages were put in the bank, he supposed by his father, for collection, and were there some time, and that the witness left some discharges of these mortgages at the bank to be delivered upon payment.　He continued:

" *Q.* Now, what instruction, if any, did you leave for Mr. Bradley, when you left those discharges?

" *A.* My father's instructions and mine both were that as soon as those mortgages were paid to notify us,—notify me there at the store, because the most convenient.　\*　\*　\*

" *Q.* Was anything said by you or by your father to Mr. Bradley about that money being placed to his credit in the bank when it was paid?

" *A.* I remember this: my father telling him that he didn't want it to go to his credit; that he had a place for it.　And I told Mr. Bradley distinctly that we wanted to be notified as soon as that was paid; let us know, as father had a place for it,—then had a place for $5,000 money; and he wanted it just as soon as it was paid in."

This testimony is undisputed.　It also appears that the amount paid upon the mortgages was not credited upon the account of Johnson, but was credited to " cashier's account" until the 18th of April, when it was carried to Johnson's account, apparently with debits consisting of a

cash payment of $5,000, and a draft, which will be mentioned later. Petitioner asks relief, upon the theory that this was a special deposit; that it was the duty of the bank to collect the money, and hold it for him, and not treat it as money paid to the bank in the ordinary way, subject to be mingled with other moneys of the bank, credit to be given to petitioner; and that, although the bank did mingle it with other funds, it was wrongfully done, and the fact would not prevent petitioner's recovery thereof if the bank still had sufficient of the fund on hand. Evidence was introduced showing that the bank had more than the amount claimed on hand at all times after the mortgages were paid until the receiver took possession.

On behalf of the receiver it is contended that the petitioner was not entitled to the relief granted for several reasons:

1. Because the bank did not receive payment in money.
2. Because it received nothing, unless it was a credit with some other bank, and there is no proof that it ever received a dollar upon that credit.
3. Because, if it was a trust fund, it was divested of that character by the act of the petitioner's agent.

Bradley testified that he delivered the discharges upon receipt of the checks of the building and loan association. He had previously said that $4,300 of the money to pay up the mortgages was furnished through Mr. Ostrander, and the Capitol Building & Loan Association furnished the remainder that was paid. This is all that we discover in the testimony upon the subject of the method of payment. The respective amounts appear credited to the cashier's account, as already stated. Whether these checks were payable upon Lansing banks or foreign banks does not appear. Section 3 of the petition alleges that the amount claimed "was paid to the said Nelson Bradley on the 14th day of April, 1893, and that he thereupon held

the money on behalf of petitioner as his agent, and delivered the notes, mortgages, and discharges to the person who paid the same." Section 7 of the answer "admits that on April 14 last the amount due upon the mortgages was paid to the cashier,"—*i. e.*, Mr. Bradley; also that the notes and mortgages were delivered, etc. It denies that the bank held the money on behalf of the petitioner as agent. Section 8 of the answer "denies, upon information and belief, that said money was not, when so received by said cashier, deposited with the funds of the bank, but was by him held and kept as a separate deposit for petitioner until April 18;" and it avers, on like information and belief, that "when said money was so received by said cashier it was by him placed in the vaults of said bank, with the other currency belonging thereto, and the amount thereof was at once entered on the books of the bank, in what is known as the 'cashier's account,' to the credit of said petitioner." The witness Augustus Crane, an employé of the bank, stated that the cashier's account "shows money that was left in the bank for a short time, to be paid out without starting a special account for that money or credit."

The evidence quoted, together with the allegations of the petition which were admitted by the answer, may be said to establish the fact that the bank was expressly prohibited from placing the proceeds of the mortgages to the credit of the petitioner in any such way or sense as to establish the relation of debtor and creditor between the bank and himself, and that the bank received the money. Force is added to this by the fact that the petitioner was not credited, but the amount was carried in a fictitious account, called "cashier's account." Moreover, there is nothing to show that this money was at once mingled with other funds, unless it be the answer, which says that

103 MICH.—8.

" when said money was so received it was placed in the vaults of said bank, with other currency belonging thereto.' This statement is not necessarily inconsistent with the idea that the fund was kept separate; nor is the fact—if it be one—that previous to April 18 it was included in daily balances, which was obviously necessary if the bank books were to be made to show a balance. The averment in the answer has no force except as a pleading and by way of admission, unless supported by evidence. It was the duty of the bank to collect and pay over to the petitioner the money, and it was his agent for the purpose, and the proceeds of the mortgages were his property as much as the mortgages were. If the bank took the responsibility. of receiving checks, they were his checks, if he chose to receive them; and it was the duty of the bank to use diligence in collecting the money upon the checks, and, when paid, such money became the property of the petitioner. *Bank v. Armstrong*, 39 Fed. Rep. 684; Morse, Banks, §§ 214, 248; *McLeod v. Evans*, 66 Wis. 401. We find, therefore, under the pleadings and evidence, that the bank received the money, and in the capacity of agent, and that the title to such money was in the petitioner.

It remains to inquire whether the right to recover the same has been cut off—*First*, by the action of the bank or receiver in mingling the funds, or not keeping them separate, so that the identity of the money received is lost; or, *second*, by the acceptance by the petitioner's agent of $5,000 in cash and a draft upon a Detroit bank for the remainder of the amount. As already stated, it is not shown that the money was mingled with other funds when received. It seems, however, to be conceded that at some time it was mingled, either by the bank or the commissioner or the receiver, and practically it makes little difference which, except as it might bear upon the question

whether the fund of which it became a part had, at any time prior to the filing of the petition, been exhausted, so that it can be said that the fund then sought to be reached not only did not contain any of the identical money, but that, treated as a fund, it was wholly from a different source. If it be decided that the money became mingled with bank funds by the act of the officers of the bank, there can be no doubt that, as between petitioner and the bank, the former had a lien upon the whole fund; and courts would not be overtechnical or zealous in seeking an opportunity to say that the property could not be traced, or had disappeared from the fund altogether, where there was evidence from which the contrary might be legitimately inferred. There is no claim that the receiver took the assets of the bank discharged of any legal or equitable obligations previously resting upon the bank, so far as the interests of the bank are concerned. Whatever, if any, modification there may be upon this statement, must result from the rights of general creditors, and the favorable disposition of the law towards an equal distribution of insolvent estates, which is obvious from the legislation upon the subject. *Stone v. Dodge,* 96 Mich. 521. If the trust actually existed, and the identical fund received had been intact when it came into the hands of the receiver, it would have been subject to the petitioner's claim. Why should it be any less so if it is clear that the fund into which it went (such fund being money legally belonging to the bank) never was reduced to the amount of the trust fund? The bank could not complain, for the decisions are numerous that the claim of the *cestui que trust* would become a lien upon the entire fund when the intermingling occurred, and the law would presume that the trust fund was not paid out as long as an equal amount remained. *Silk Co. v. Flanders,* 87 Wis. 237, and cases cited. See *Wisconsin Marine & Fire Ins. Co. Bank*

*v. Salt & Lumber Co.*, 77 Mich. 81. The evidence discloses that the fund on hand showed a balance in excess of the amount of the trust fund each day from the receipt of the money until the doors of the bank were closed. There is no reason why we should indulge in a presumption that at some time during those days the fund was lower, especially as it should be demonstrable from the books of the bank, in the hands of the receiver, if it were true. We have reached a point, then, where it may be said that the fund which came to the receiver contained the trust fund, but it is necessarily impossible to say that it included the identical money received by the bank. But that is unnecessary, under the modern authorities, where it appears, as we find here, that the money treated as a trust fund was a component part of the money in the hands of the debtor. We think it unnecessary to enter at length upon a discussion of this question or citation of authorities. The briefs of counsel for the appellee contain them,[1] and the subject was recently reviewed by the supreme court of Wisconsin in the case of *Silk Co. v. Flanders, supra.* See, also, *Cavin v. Gleason*, 105 N. Y. 256, where many authorities will be found.

We think the Michigan cases cited by counsel for the appellant are not at variance with this doctrine. In the case of *Wisconsin Marine & Fire Ins. Co. Bank v. Salt & Lumber Co.*, 77 Mich. 81, this Court declined to apply the doctrine therein cited from the Janeway case, that,—

"Where the trust property does not remain in specie,

---

[1] Counsel cited: *McLeod v. Evans*, 66 Wis. 401; *Carley v. Graves*, 85 Mich. 483; *Sherwood v. Bank*, 94 Id. 78; *First Nat. Bank of Crown Point v. First Nat. Bank of Richmond*, 76 Ind. 561; *Kimmel v. Dickson* (S. D.), 58 N. W. Rep. 561; *Peak v. Ellicott*, 30 Kan. 156; *Ellicott v. Barnes*, 31 Id. 170; *Harrison v. Smith*, 83 Mo. 210; *National Bank v. Insurance Co.*, 104 U. S. 54; *Jewett v. Dringer*, 30 N. J. Eq. 291.

but has been made way with by the trustee, the *cestui que trusts* have no longer any specific remedy against any part of his estate in bankruptcy or insolvency, but they must come in *pari passu* with the other creditors, and prove against the trustee's estate for the amount due them."

In *Sherwood v. Bank*, 94 Mich. 78, 82, the case was decided upon the point that—

"There was no appropriation of the proceeds of the check; no mingling of the money realized from it with the assets of the bank for its own benefit, as there was no money realized from it; nor any use made of it by the bank, either to pay off its debts or to increase its assets."

The remaining question may be easily disposed of. The evidence shows that the bank closed its doors on April 18. Shortly before, and upon the same day, petitioner's agent called for the money, and was informed by Mr. Bradley that he could not pay it. He finally paid $5,000, received in the meantime from Mr. Bement, and gave a draft on Detroit for the remainder, which draft was never paid. We have found that the statement that the bank had not got the money, or what, under the circumstances, was equivalent, that it could not pay the sum collected, was untrue, because at the very time the amount lay in its vault as a part of its assets. If, under such false representation, the petitioner received the draft believing and relying upon the false statement, it cannot be said that he waived his right to claim the fund. A waiver usually involves an intention to yield some known right, or something equivalent to such intention, in the nature of an estoppel. There is no such estoppel here. It would be much more equitable to say that the bank and its receiver are estopped from claiming such an estoppel.

It remains to be said that the decree will be affirmed, with costs.

The other Justices concurred.