In the Matter of MICHIGAN BOILER & ENGINEERING COMPANY a/k/a Michigan Boiler & Engineering Co., a/k/a Michigan Boiler & Engineering Co., a Michigan corporation, a/k/a M.B. & E., Inc., Debtor.

DISTRAL ENERGY CORPORATION,
Plaintiff,

v.

MICHIGAN BOILER & ENGINEERING COMPANY, Defendant.

Bankruptcy No. 86–06680–S.
Adv. No. 89–0431–S.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Dec. 6, 1993.

**566**

Phillip G. Alber, Raymond C. McVeigh, Detroit, MI, for plaintiff.

Jay L. Welford, R. Christopher Cataldo, Detroit, MI, for defendant.

## OPINION

WALTER SHAPERO, Bankruptcy Judge.

### Introduction

Distral Energy Corporation ("Distral"), a creditor of Debtor Michigan Boiler and Engineering Company ("Debtor" or "MBE"), commenced an adversary proceeding seeking recovery of alleged trust funds in the amount of $139,311.19[1], which it alleges are not assets of the Debtor's estate.

### Stipulated and Other Facts

The parties stipulated to the following facts:

(1) Distral is a New York corporation with its principal place of business located at 1125 Northeast 7th Avenue in Dania, Florida.

(2) MBE had its principal place of business at 24601 Vreeland Road in Flat Rock, Michigan.

(3) MBE's Chapter 11 petition was filed on December 31, 1986. A Trustee was appointed on or about February 6, 1987, and has served continuously in that capacity since that date. Collins' (the Trustee) and Debtor's principal place of business is currently located at 14717 Champaign, Allen Park, Michigan.

(4) For more than 30 years prior to the date of the petition MBE was retained as a contractor on hundreds of projects in the construction industry, principally relating to the installation, repair and maintenance of industrial equipment known as boilers. The projects usually involved labor intensive, high precision work on enormous pieces of equipment. For example, MBE regularly contracted with Detroit Edison to service its boilers, the largest of which are over 10 stories high.

(5) The Michigan Building Contract Fund Act, Mich.Comp. Laws Ann. § 570.151 *et seq.*, commonly known as the "Trust Fund Act", provides that the owner's payment on a project constitutes a "trust fund" of which the laborers, subcontractors and materialmen on that project are the beneficiaries.[2] Prior to Collins' appointment as Trustee, MBE frequently failed to comply with the Act and frequently failed to pay the laborers, subcontractors and materialmen on a given project from funds received from the owner on that project.

(6) MBE maintained account number 200 008383 at Manufacturers National Bank of Detroit as its general checking account (the "Account"). Most, if not all, payments received by MBE from its customers, including those subject to the "Trust Fund Act", were deposited into this Account and commingled.

---

1. Distral asserts it is owed a total of $704,640.80 by the Debtor. It seeks $139,311.19 in this adversary proceeding.

2. The Michigan Building Contract Fund Act provides that:

    In the building construction industry, the building contract fund paid by any person to a contractor or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes.
    Mich.Stat.Ann. § 26.331 *et seq.;* Mich.Comp. Laws Ann. § 570.151 *et seq.*

MBE paid its general expenses from this Account. Funds were not necessarily paid to subcontractors on a particular project when the owner paid MBE. At all times relevant to this adversary proceeding, MBE paid subcontractors on an as needed basis, and then only with the commingled funds.

(7) Since his appointment, Collins has conscientiously attempted to fully comply with the Trust Fund Act. For all payments received by MBE, which were known by Collins to be subject to the Trust Fund Act, Collins has paid the subcontractors, laborers and materialmen on those projects with those funds.

(8) Prior to October 31, 1985, MBE contracted with the Fletcher Paper Company ("Fletcher") for sale and installation by MBE of a boiler, boiler stoker and baghouse equipment at Fletcher's facility in Alpena, Michigan.

(9) On or about October 31, 1985, MBE contracted with Distral, pursuant to MBE Purchase Order No. F09095–9028, for the manufacture and/or sale by Distral of one 70,000 pound per hour Distral boiler and attendant components (for the Fletcher project), for the contract price of $844,840 (later increased to $863,308). Distral fully performed this contract.

(10) On or about September 10, 1986, MBE executed and tendered to Fetcher a sworn statement representing that MBE had paid to Distral the sum of $926,211.

(11) Fletcher paid to MBE the sum of $770,224.50 which was deposited into the Account on October 8, 1986 ("Fletcher Payment").

(12) MBE paid Distral $158,667.20 on the Fletcher project, leaving a balance owing to Distral from MBE of $704,640.80. MBE owes $160,351 to other laborers, subcontractors and materialmen on the Fletcher project.

(13) All deposits generated from construction projects and deposited into the Account, including the $770,224.50 received on October 8, 1986, are "trust funds" pursuant to the Act.

(14) All of MBE's laborers, materialmen and subcontractors on construction projects are beneficiaries of the trust imposed by the Trust Fund Act on the owner's payments on those respective projects. Distral and the other unpaid subcontractors, laborers and materialmen on the Fletcher project are the beneficiaries of the trust imposed by the Trust Fund Act upon the funds paid to MBE by Fletcher.

(15) At the close of business on October 7, 1986, the balance of the Account was $464,-722.47. The Fletcher Payment was deposited into the Account on October 8, 1986. MBE distributed $172,454.73 from the Account on October 8, 1986. It is unknown whether some or all of the $172,454.73 was paid out before the deposit of the Fletcher payment.

(16) The total of daily deposits, disbursements and balance at the close of business on the Account for each day during the period July 1, 1986 through December 15, 1986 is set forth on the schedule submitted as Defendant's Exhibit B. (Attached to this opinion, as Exhibit A, is the portion of the referred to Defendant's Exhibit B, covering the period from October 1, 1986 through December 15, 1986.)

Additional facts or factual conclusions which this Court feels may be found by reference to the various exhibits and inferences to be drawn from the aforementioned stipulated facts and those exhibits are:

(A) Prior to and after the deposit of the Fletcher Payment on October 8, 1986, hundreds (if not more) of other "trust fund" payments were deposited into the Account and commingled. Defendants' Exhibit A (a summary of MBE's cash receipts detail ledger for the period of July 1, 1986 through December 15, 1986) shows all trust fund and other deposits during that period. During July, 1986, MBE deposited some 85 separate "trust fund" payments into the Account totaling approximately $2 million dollars. In August, 1986, MBE deposited 58 separate "trust fund" payments into the Account totaling approximately $3.3 million dollars. In September, 1986, MBE deposited 140 separate "trust fund" payments into the account totalling approximately $3.5 million.

(B) From October 1 through October 7, 1986, the week prior to the deposit of the Fletcher Payment, MBE deposited some 27 separate "trust fund" payments into the Account totalling approximately $950,000.

(C) During the period October 9, 1986 through October 16, 1986, the week after the deposit of the Fletcher Payment, MBE deposited some 6 separate "trust fund" payments into the account totaling approximately $42,000. From October 17, 1986 through November 14, 1986, MBE deposited over a 100 separate "trust fund" payments into the Account totaling approximately $2.2 million. No deposits were made into the Account on November 15 and 16. During the period November 17, 1986 through December 10, 1986, MBE deposited some 81 separate "trust fund" deposits into the Account totaling approximately $1.7 million dollars.

(D) Not all deposits into the Account were "trust funds". For example, entries for July 3, 1986, July 21, 1986, August 8, 1986, August 19, 1986, August 26, 1986, September 2, 1986, September 10, 1986, September 17, 1986, etc., show thousands of dollars of wire transfer deposits, apparently from MBE's lender.

(E) As shown in Defendant's Exhibit B (part of which is attached as Exhibit A to this Opinion), MBE paid out $39,941.84 in checks on July 1, 1986, $49,594.10 on July 2, 1986, etc., for a total of $1.79 million during the month of July. Similarly, $3.35 million was paid from the Account in August, 1986; $3.58 million in September, 1986; over $2.66 million in October, 1986; over $2 million in November, 1986; and over $1.17 million during the first two weeks of December, 1986.

(F) Many, many, trust fund and non-trust fund payments were thus deposited into the Account and commingled after the deposit of the Fletcher Payment on October 8, 1986.

(G) MBE has some 214 unpaid trust fund creditors with claims against the estate totaling approximately $2.3 million.

(H) MBE's "trust fund" payables to all of its trade creditors at the end of the indicated months in 1986 were approximately as follows:

| | |
|---|---|
| July | $3.913 million |
| August | $3.380 million |
| September | $4.466 million |
| October | $4.980 million |
| November | $5.580 million |
| December | $5.167 million |

(I) During the period July 31, 1986 through December 15, 1986, MBE's cash on hand, as shown by the Account balance(s) was always less than the total amount then owed to all trust fund claimants. The Account's highest balance was on September 12, 1986 when it reached $1,367,419.79. The Account's lowest balance during this period was on December 10, 1986 when it fell to a *negative* $7,030.17.

Other facts as they relate to various issues will be referred to later in this Opinion.

### Prior Proceedings and Submission of Case

Distral commenced this adversary proceeding essentially and initially asking that an amount equal to the total of what it was owed be declared not to be property of the estate, but rather a trust fund held for Distral's benefit under the Trust Fund Act. Distral filed a Motion for Summary Disposition and the Trustee filed a Motion to Dismiss, Cross–Motion for Summary Judgment or, in the alternative, Partial Summary Judgment. The primary basis for the Trustee's defense to Distral's motion, as well as the Trustee's own motions, was that Distral is required to trace the specific funds received by Debtor from Fletcher and may recover only from those specifically traced funds; and as a matter of law, Distral was, or would be, unable to do so. Distral argued, among other things, that there is no Michigan or otherwise applicable case law compelling such tracing in the context of a trust created under the Trust Fund Act. After hearing the motions, this Court issued a written Opinion ("Opinion") denying both parties motions. Adopting what it felt was well established law in the Sixth Circuit (applying Michigan law), this Court on page 3 of its said Opinion concluded:

  * * * that in a commingling situation, if the trust fund cannot be identified or traced in its original or substituted form the trust beneficiary becomes a general

creditor. The trust beneficiary must trace the trust funds through the commingled account(s) and it is not enough to simply show that trust funds went *into* the commingled account. *See Selby v. Ford Motor Company,* 590 F.2d 642 (6th Cir.1979); *First Federal of Michigan v. Barrow,* 878 F.2d 912 (6th Cir.1989).

*Distral Energy Corporation v. Michigan Boiler & Engineering Company,* Adv. No. 89–0431 (Bankr.E.D.Mich. Oct. 5, 1990).

Following the Opinion, the matter was set for trial to permit Distral to attempt to trace. The case was eventually submitted on the basis of stipulated facts and exhibits. Distral has the burden of proof by a preponderance of the evidence (though some say, by a "clear" preponderance). *First National Bank of Princeton, Illinois v. Littlefield, Trustee,* 226 U.S. 110, 33 S.Ct. 78, 57 L.Ed. 145 (1912); *Schuyler v. Littlefield, Trustee,* 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806 (1913); *Board of Fire & Water Commissioners of Marquette v. Wilkinson,* 119 Mich. 655, 78 N.W. 893 (1899).

### Positions of the Parties

Distral makes the following arguments in support of its claim that it has been able to trace $139,311.19 of the Fletcher Payment deposited in the commingled Account:

(1) Distral does not seek any preference or priority in any assets of Debtor's estate ahead of any other estate creditors. Rather, it seeks to isolate and trace certain trust fund monies which are not assets of the estate;

(2) The funds received by Debtor from Fletcher are within the purview of the Trust Fund Act and were therefore held in trust for Distral. As such, the Fletcher contract proceeds are not part of Debtor's bankruptcy estate;

(3) Distral has identified certain "window periods" as the periods when Debtor expended all other funds from the Account, such that the only remaining funds must be concluded to be those received by Debtor from Fletcher. Based on Michigan case law, Distral has employed the presumption that the subject trust monies were the last monies paid out of the commingled Account by the Trustee;

(4) Specific payments from the Account could be identified as trust fund monies and then traced into other projects which later generated revenues which were deposited back into the Account; and

(5) Distral also continues to argue that even if it could not trace the Fletcher trust funds into subsequently received contract proceeds, Michigan law would recognize Distral's right to recover pursuant to its trust claim.

In response, Debtor/Trustee asserts that Distral has failed to establish that the Trustee holds any trust property belonging to Distral for five (5) reasons:

(1) Distral's tracing theory is based solely on the presumption that Debtor paid out all other trust funds before paying out the proceeds of the October 8, 1986 Fletcher payment. There is no factual or legal basis to presume that Debtor expended the balance of any one trust before that of another;

(2) Under Michigan law, the circumstances of the commingling of multiple trusts in this case eliminates any presumption that the commingled funds retained their trust fund character and all trust fund creditors of the estate, including Distral, must be treated as general creditors;

(3) The relief sought by Distral would violate the rights of all other creditors of the estate, particularly the 213 other trust fund creditors who are equally situated with Distral;

(4) Distral claims that certain labor costs of Debtor were paid for with Distral's trust fund monies, but it failed to offer proof to establish this point; and

(5) Distral has offered no, or insufficient, tracing proof regarding the funds currently in the Trustee's possession.

### Discussion

Initially it would be appropriate to reiterate and confirm the correctness of this

Court's prior conclusion, set forth in its Opinion, that tracing is both (a) required in this situation, and (b) not accomplished by the mere showing that the Fletcher Payment was indeed deposited in the commingled Account. As support, the Court refers to the authorities set forth in the Opinion, and refers as well to *In re U.S. Lines, Inc.,* 79 B.R. 542, 545 (Bankr.S.D.N.Y.1987); *In re Atlantic Mortgage Corp.,* 69 B.R. 321 (Bankr. E.D.Mich 1987); *Board of Fire & Water Commissioners of Marquette v. Wilkinson,* 119 Mich. 655, 78 N.W. 893 (1899); *Reichert v. United Savings Bank,* 255 Mich. 685, 239 N.W. 393 (1931); and, George Gleason Bogert, *Trusts and Trustees,* § 921 (Revised 2d ed.1982) where it is stated:

> The generally adopted view denies the remedy of tracing where proof of the beneficiary-claimant merely shows the receipt of trust property by the defendant and makes no case as to its subsequent history or its existence among the present assets of the defendant ...

*See also, St Louis & S.F.R. Co. v. Spiller,* 274 U.S. 304, 47 S.Ct. 635, 71 L.Ed. 1060 (1927).[3]

■ Here we are dealing with an attempt to trace dollars placed in a commingled bank account. Plaintiff's burden is that fair certainty of tracing such funds into the exact property in question must be testimonially established. *Fidelity & Deposit Company of Maryland v. Stordahl,* 353 Mich. 354, 359, 91 N.W.2d 533, 536 (1958). In *Attorney General v. Michigan Savings Bank of Vassar,* 278 Mich. 225, 227, 270 N.W. 276, 277 (1936) the court stated:

> The rule is that a trust fund may be followed and the trust impressed upon property into which the fund may be traced. The rule is the same when the fund cannot be traced into specific property and it is sought to impress the trust upon the cash in possession of the trustee. But in the latter case the rule is aided by a legal fiction. If the trustee maintains an uninterrupted cash balance equal to or greater than the trust fund, the law raises the presumption that, although he is a trustee ex maleficio, he nevertheless is comparatively honest and has kept the trust fund intact and in cash. But, of course, such fiction and presumption can exist only if the cash kept on hand equals or exceeds the total of all like trust funds. The rule and fiction are amply discussed in *American Employers Ins. Co. v. Maynard,* 247 Mich. 638 [226 N.W. 686 (1929) ]; *Reichert v. United Savings Bank,* 255 Mich. 685 [239 N.W. 393] (82 A.L.R. 33) [ (1932) ]; *Reichert v. Fidelity Bank & Trust Co.,* 261 Mich. 107, 115, 117 [245 N.W. 808 (1933) ]; *Reichert v. Lochmoor State Bank,* 272 Mich. 433 [262 N.W. 386 (1935) ]; *Intercollegiate Alumni Club v. Kirchner,* 272 Mich. 466 [262 N.W. 285 (1935) ].

The fiction or presumption referred to was articulated in the cited *Maynard* case, in which the court stated:

> If such balance had been maintained at an amount equal to or greater than the amount of the trust fund, there would arise a presumption that the trust money had been kept intact. This presumption would be justified on the theory that a man is presumed to have acted honestly and to have paid out the cash received from other sources other rather than that which was committed to him in trust. *Board of Water Com'rs, supra; Sherwood v. Savings Bank,* 103 Mich. 109 [61 N.W. 352]; *Brady v. American National Bank,* 120 Okla. 159 (250 Pac. 1006).

*Maynard,* 247 Mich. at 641, 226 N.W. at 687.

■ Thus in a situation, for example, where a trustee commingles with his own funds of $100, the additional sum of $200 representing a trust fund, and thereafter disburses funds from that commingled account, the referred to presumption or fiction dictates that the sums disbursed are presumed to be first out of the trustee's own $100. To the extent that more than $100 is disbursed

---

**3.** While the reference is probably not necessary, in this connection it would appear that *First Federal of Michigan v. Barrow,* 878 F.2d 912 (6th Cir.1989) cited in the Opinion is the latest word in this Circuit on the subject and essentially comes to a different conclusion than that reached or stated by the Bankruptcy Court in *In re Mahon Industrial Corp.,* 20 B.R. 833, 836 (Bank. E.D.Mich.1982).

(and assuming for the moment there have been no additions to the fund), thus reducing the amount present in the commingled fund below the amount of the originally added trust funds (i.e.: below $200 in the example), the trust funds will be regarded as having been dissipated to that extent. This means that the limit of the cestui que trust's recovery would be the lowest amount (or lowest intermediate balance) to which the cash funds will have gone. *See e.g.,* 4 *Collier on Bankruptcy,* § 541.13 (15th ed.1993).

■ However, this case is not as simple as the indicated example because the facts show:

(1) A substantial portion, if not all, of the balance in the Account just prior to the deposit of the Fletcher Payment, were "trust funds";

(2) After the deposit of the Fletcher Payment, additional "trust fund" payments made to MBE were deposited in the Account through December 10, 1986 totalling over $3.9 million dollars; and,

(3) After the deposit of the Fletcher Payment starting in October and going through December 10, 1986, millions of dollars in disbursements were made out of the Account, primarily, it must be inferred, to persons or entities who were in a class who must be considered to also be trust fund beneficiaries, and in addition to recipients who were not in such a class.

Properly characterized we are thus dealing with an account which was the recipient of funds from owners of any number of construction jobs or situations. The payments to MBE, under the law, each give rise to separate trust funds. All monies were commingled in the Account under circumstances where additions and subtractions were being made almost on a daily basis, and where some, albeit probably not a very large portion of the monies deposited, were not trust funds (i.e.: were monies from MBE's lender, for example) and where some of those monies were disbursed to non-trust fund beneficiaries (i.e.: for example, in payment of corporate overhead expenses of MBE).

Forgetting for the moment any deposits made after the Fletcher Payment and applying the presumption (normally made in a situation where the other funds in the account were non-trust or "personal" funds of the trustee), we have a situation where there was $464,722.47 in the Account just before the deposit of the Fletcher Payment of $770,-224.50. The indicated presumption (of partial honesty), if applicable, would·mean that the disbursements thereafter made were deemed to first come out of·the $464,722.47, and after that sum had been disbursed, the disbursements were deemed to come out of the $770,220.50 (also assuming for argument's sake that no other funds came into the account or that if they did they are to be ignored—a circumstance to be dealt with later). The facts show that in a very short order more than $464,722.47 had been disbursed, and before the end of October, in excess of the total of $464,722.47 plus $770,-224.50 (or $1,234,942.97) had likewise been disbursed. Thus, on those assumptions and on the indicated analysis the "trust fund" would have been depleted completely; and, of course, as of December 10, 1986, the balance in the account had gone to overdraft, or less than zero, taking into account all Account activity up until that time.

■ As is also indicated by some of the cited authorities (1) any additional monies from other sources (normally non-trust fund sources) deposited in the commingled account, for purposes of the tracing analysis, will not be treated as part of the trust-fund (unless such can be shown to have been intended as a restoration of any depleted trust funds), and (2) any further disbursements during the period these additional deposits were made should similarly be presumed to have been made first from those additional deposits. Applying those principles in this case, one starts with the propositions that (1) as of the time of the Fletcher Payment (and before the deduction of the checks which cleared on the same day), MBE had a total of $1,234,942.97 in the account of which $770,224.50 was the claimed Distral trust monies and the balance of $464,722.47 consisted largely if not exclusively of other trust monies and some non-trust monies, and (2) adding all subsequent receipts to the

$464,722.47 portion, and subtracting all subsequent "checks cleared" first from the same $464,722.47, until it reached zero, would be subtracted from the Fletcher Payment amount claimed as the Distral trust monies. If one does that on a day by day basis, one reaches the result that as of October 16, 1986, the claimed Distral trust fund was reduced to about $161,584. Thereafter, analyzing the excess of disbursements over receipts for the entire period between October 17, 1986 and December 10, 1986, inclusively on a total basis (rather than day by day which should not change the eventual result), one sees that the entire $161,584.52 had been in effect used up. (Note—there is no proof or attempted proof that any additions to the Account were in any way intended to restore any *particular* trust fund amounts, as such.)

The foregoing analysis thus does not appear to produce a result favorable to Distral, despite the fact that its application gives Distral the benefit of a presumption that all disbursements subsequent to receipt of the Fletcher Payment (and theoretical creation of the trust fund) be deemed to come first out of other monies on hand (usually non-trust monies) at that time and second out of any new monies thereafter received (whether trust or non-trust) until such can be deemed to have been exhausted.

Moreover while the indicated presumption has some rationale in situations where funds of a single trust have been commingled with personal or non trust funds of the trustee, it is quite a different situation where, as here, what is involved is essentially the commingling of funds of multiple trusts.

In the cited *Michigan Savings Bank of Vassar* case, a number of municipalities and an intervening school district were contending for funds in the hands of the receiver of an insolvent bank. The lower court denied the request of the Village of Vassar (one of the claiming municipalities) to impose a trust on the monies in the receiver's hands to the extent of its claim. That claim was eventually settled and another claimant (the intervening school district) asked for full payment of its claim on a trust fund theory. By including the settled claim of the Village of Vassar, the alleged trust fund claims of all of the claimants exceeded the available monies. The Michigan Supreme Court reversed the lower court's decision in favor of the intervening school district. In doing so (and in addition to what this Court had already quoted from that decision) that court said:

> Intervener, however, contends that the denial of preference to the village of Vassar by the court wholly eliminated that claim from consideration and the other municipal deposits may be impressed as trusts because the cash on hand exceeded their total.
>
> The contention, if adopted, would have interesting results. In cases where there are a number of trusts *ex maleficio* and their total sum exceeds the cash on hand, the court would be obliged to deny preference to those first petitioning or first heard and to order paid in full those presenting their claims after the process of attrition has reduced the total outstanding trusts to a point equal to the cash balance. This would require us to add a new and hardly tenable fiction to the doctrine of trusts *ex maleficio,* that the trustee has kept on hand only the funds of those strategically or luckily latest in the line of future litigants.
>
> As indicated by the cases above cited, the presumption may be applied only if the cash on hand equals or exceeds the sum of all the trusts; ...

*Michigan Savings Bank of Vassar,* 278 Mich. at 227, 228, 270 N.W. at 277.

In a law review note concerning trusts and the tracing principles applicable where funds of two or more cestuis are wrongfully commingled, the author states after summarizing and referring to the opinion in the *Michigan Savings Bank of Vassar* case:

> Where, however, the commingled funds consists primarily of funds impressed with a trust, so that the contest is essentially between the cestuis themselves, the Michigan court held in the principal case, and has held in previous cases (case cites omitted), that tracing on a constructive trust theory will not be aided by the presumption of rightful withdrawal. Such holding is manifestly just, as it cannot be presumed that the trustee intended to wrong

one cestui in favor of another; and a contrary holding would create a preference in favor of the cestui que trust over others of equal equities. Other courts have laid down the similar rule.

*Trusts—Tracing Principles Applicable Where Funds of Two or More Cestuis are Wrongfully Commingled,* 35 Mich.L.Rev. 1203, 1204 (1937).

Many authorities deal with the tracing issue in the context of the trustees mixing its own personal funds with those of two or more trusts, as well as in the context of all of the funds involved being various trust funds. Similarly, the situations are made more complex by additional receipts from either personal funds, trust funds, or both, and later disbursements for the benefit of both trust and non-trust fund beneficiaries (represented in this case, for example, by receipts from non-trust fund sources and disbursements for corporate overhead for clearly non-trust purposes). This case is a worst case scenario encompassing most, if not all, of those elements. For further discussion *see,* George Gleason Bogert, *Trust and Trustees,* §§ 922, 926, 927 (Rev.2d ed. 1982); *Restatement (Second) of Trusts* § 202 (1959); *Restatement of Restitution* §§ 209, 211 (1937); *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); cf. *In re Walter J. Schmidt & Co.,* 298 F. 314, 316 (D.C.N.Y. 1923).[4]

■ The essential point is that in a multiple commingled trust fund situation, irrespective of whether or not any "personal" (i.e.: non-trust) funds of the trustee are commingled or whether there was a particular plan (as there was here) on the part of the trustee (debtor) as to which funds were being used for what, any presumptions as to which monies were used first, and for what, are

baseless and purely arbitrary and would lead to inequitable results which favor one similarly situated trust fund cestui over another for no cognizable reason.

There were multiple trust funds created with respect to virtually every one of debtor's jobs in this case and, no doubt, multiple cestuis of each one. All were equally innocent in the aftermath of the debtor's failure to deal appropriately with each of their trust funds, and all are (or were) in a position to make similar arguments to those of Distral.

The case of *In re Heston Oil Company,* 63 B.R. 711 (Bankr.N.D.Okla.1986) presents a similar situation. There a creditor ("Bi–State") sought the imposition of a constructive trust on the debtor's ("Heston") general bank account. The creditor's money had been deposited in that account, which contained, inter alia, other trust funds. The deposit of the creditor's funds in excess of $5 million dollars was deposited in the account and a slightly smaller total amount was withdrawn, by a series of individual transactions. After recounting the need for tracing and after reviewing other applicable principles of law, the court, in refusing to find a constructive trust, stated as follows:

> Although BiState can show that its funds went into said general account, BiState cannot distinguish them from other trusts' monies, and therefore cannot identify them in any meaningful sense. There is no presumption that Heston meant to withdraw money of one trust beneficiary before that of another. Indeed there is no reason in equity for any such presumption, for all of the trust's beneficiaries are equally innocent.

*Heston Oil Company,* 63 B.R. at 715.

Answering the creditor's argument that later deposits were in effect replenishments

4. It should be noted that what is primarily before the Court at this time is solely the claim of Distral to a part of the Trustee's funds. Many of the cited authorities, specifically or inferentially also deal with the consequent (i.e.: after failed tracing attempts) issue as to how and among whom the remaining funds are to be divided, and in which way, i.e.: are the remaining funds all to be considered trust funds to be divided in some fashion solely among the cestui's or are the cestui's general creditors of the debtor who must share the remaining funds with all general creditors. There are various theories on whether to allocate the monies as trust funds or as non-trust funds and on the appropriate division of the funds as between the cestui's, if division is to be limited to that class. Suffice it to say, however, that issue is *not* being decided here. While Distral has specifically asked, in the alternative, that the Court rule now that all of the funds belong solely to the cestui's, the Court declines to so rule without further development of the facts and the law. Aside from the indicated legal issue it is not at all clear how much difference it might make in the ultimate distribution or whether that difference would be worth litigating.

of its depleted trusts funds in account, the court stated:

This proposition is unsound for several reasons. First, payment of expenses is not the sort of augmentation of estate which justifies imposition of a constructive trust, and an unknown part of Heston's withdrawals went to mere payment of expenses for drilling and operating expenses. Second, property acquired with trust funds may not itself be subject to imposition of a constructive trust, but only imposition of an equitable lien. Third. Since such withdrawals drew upon the monies of all trust claimants in the account, profits must have been obtained with the monies of *all* trust claimants, and later *all* deposits must have been replenished *all* of the depleted trust funds in some measure, practically impossible, to calculate. BiState has no claim to replenishment deposits exclusive of other trust beneficiaries even if BiState can show that its funds were translated into oil and gas revenues redeposited in said account, BiState cannot distinguish them from other trust monies similarly used, and, therefore, cannot identify them in any meaningful sense. There is no presumption that Heston meant to replenish the funds of any one of the trust beneficiaries before any of the others; indeed, there is no reason in equity for such presumption, for all of the trust beneficiaries are equally innocent.

*Id.* at 715–716.

Dealing with the tracing problem generally the court stated:

The calculations would be difficult, involving the percent of each trust claimant's deposit to the total deposit, a percent of the withdrawals applied to identifiable properties, the percent of revenues from such properties deposited in the account to total deposits after some date, adjustments to all of the above according to the dates separate trust funds were deposited, and some sort of integration or reconciliation of all of these factors. The result, however sophisticated, and hopefully accurate, would only ever be an estimate. And in assigning various portions of the present account balance to various claimants ac-

cording to their estimated contribution, it would approximate the sort of pro-rata recovery that is the normal lot of unsecured creditors. *Such a complicated and expensive exercise in juggling figures is in no sense an identification of BiState's or any other trust claimant's separate property; rather, it is an artificial reconstruction whose very necessity confesses that the separate property of each trust claimant can no longer be identified.* (emphasis added)

*Id.* at 716.

In that same case, the court went on to say at page 716:

BiState proposes to force Heston, by means of an accounting, to attribute some portion of said account to BiState's funds and their proceeds. Such an exercise is not only expensive, but uncalled for. It would exalt the equitable fiction of a constructive trust over the plain fact that the property of each trust claimant has lost its separate identity. In effect, the equities of the various trust claimants cancel each other out. In this case the result is *not* to reward Heston for its own wrongdoing, for Heston remains liable to these claimants as well as other creditors. The Court merely refuses to grant each trust claimant a non-statutory priority in distribution over other creditors, where such trust claimant has not carried its burden of showing that such extraordinary preference is appropriate.

*Id.*

In a valiant, and in some ways ingenious attempt to trace, Distral has isolated three so-called "window periods" setting forth the following conclusions from the indicated facts:

(1) On October 10, 1986, the balance in the Account fell below $770,224.50. Thus, MBE had expended all of the funds which were in the account prior to receipt of the Fletcher Payment and had begun using the claimed trust monies;

(2) On October 17, 1986, MBE received payments from other customers which it deposited into the Account. Just

prior to those receipts the Account balance was \$161,584.22;

(3) The Account balance did not fall below \$161,584 until November 13, 1986;

(4) On November 17, 1986, MBE deposited additional funds into the Account. Just prior to such deposits, the Account balance was \$96,053.50;

(5) The Account balance did not fall below \$96,053.50 until December 9, 1986; and

(6) On December 11, 1986, MBE deposited additional funds into the Account. Just prior to such deposits the Account balance was \$7,030.17.

From the foregoing and from other details set forth in the exhibits, Distral concludes that:

(a) MBE paid "unrelated" expenses out of the then remaining Fletcher Payment trust monies during the three window periods of October 10 through October 17, November 12 through November 17, and December 9 through December 11;

(b) The "unrelated" expenses for which the monies were used or paid, primarily consisted of laborers and suppliers of materials on various MBE jobs.

(c) MBE maintained records pursuant to which it allocated employee hours to specific jobs or projects of specific customers, as the basis for invoicing its customers for same;

(d) MBE's records indicated exactly when MBE invoiced its customers for the work covered by the payroll periods with respect to which funds were withdrawn from the Account during said window periods; and

(e) MBE's records also indicated when those customers paid those invoices, and those records show that the various customers over time (primarily after the bankruptcy petition was filed) paid MBE in respect to those invoices; such payments represented reimbursement for labor costs paid out by MBE withdrawn from the Account during the indicated window periods—totalling the sought after \$139,311.19.

The Court does not argue with the general rule that if one can trace trust funds into other or different forms or otherwise follow it in a manner that satisfies the tracing requirement, they remain trust funds.

What Distral says it has shown by the foregoing is that it has followed the remaining balance(s) of the Fletcher Payment, at various times, primarily into payroll paid out by MBE to complete other jobs and thereafter to the monies received by MBE pursuant to invoices in respect to those jobs and payroll and that such satisfies the tracing requirement.

The Court disagrees. First, the Court questions the premise of Distral's argument that as of the beginning of each of the window periods the funds in the Account all constituted the Fletcher Payment trust fund by reason of the operation of a presumption that new funds coming in were not part of the trust fund and that payments out came first out of those new funds. If, as has been noted, the presumption is inappropriate in a multiple trust fund situation like this, than it is no more logical to conclude that the funds on hand at the window periods were the Fletcher trust funds than to conclude they constituted trust funds for the beneficiaries of the various other projects involved. Second, it is quite clear that the so-called replenishment of the trust by way of later payments to MBE reimbursing it for its expended labor costs in the various jobs clearly involved monies paid by other owners in respect to other projects. In this regard, this Court agrees with the statement made in the case of *In re Hatchett's Will,* 46 N.Y.S.2d 415, 417 (1944), a tracing case involving multiple trust funds and later payments to the trustee, where the court concluded:

> The Courts can not sanction a rule that an entirely or a partly dissipated fund, which had contained various trust moneys, can be restored by the depositing of trust funds of other parties. It would be like sanctioning the robbing of Peter to pay Paul.

*See also* Bogert, *Trusts and Trustees,* § 929.

Once the trust fund had been exhausted, as it was, it would take a much clearer showing than has been made here, to conclude that funds that came in later either did

or were intended to replenish the previously totally exhausted trust fund or that Distral's situation or position was somehow being purposefully differentiated from that of other trust fund claimants similarly situated.

■ Lastly, and on a policy level, Distral argues that in case of doubt a decision in its favor is necessary to effectuate a strong public policy favoring persons in its position, as evidenced by the purpose and intent of the Trust Fund Act (particularly since it does not prohibit commingling). While the Trust Fund Act is a remedial and protective statute and, as such, ought to be construed to advance the remedy involved that principle is one of statutory construction relating primarily to the reach and breadth of the statute. It establishes a trust or trusts by statute, but in doing so, only places thusly created trust(s) on a par with other kinds of trusts, subject to whatever rules pertain to trusts generally. This is a bankruptcy case, and there does exist countervailing and stronger policy considerations in situations of this type. Thus, in a case involving the original "Ponzi" scheme, the United States Supreme Court had before it claims of many investors, and their attempts to impose constructive trusts upon part or all of the remaining funds as a defense to preference actions brought against some of the claimants who had rescinded their investment agreements and who were successful in obtaining pre-bankruptcy refunds of their investments—as opposed to those who up to that point had done nothing—all in circumstances where there were many deposits and withdrawals from the commingled account over relatively short period of time. In finding there were preferences, and thus denying that the defendants had sufficiently traced their investment, and in dealing with the various presumptions hereinbefore referred to utilized by the defendant in order to trace and identify what was paid in and what was paid out, the court in *Cunningham* said:

> The rule is useful to work out equity between a wrongdoer and a victim; but when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds perpetrated against a myriad of victims, the case is different. To say that, as between equally innocent victims, the wrongdoer, having defeasible title to the whole fund, must be presumed to have distinguished in advance between the money of those who were about to rescind and those who were not, would be carrying the fiction to a fantastic conclusion.

> \*       \*       \*

> It is a case the circumstances of which call strongly for the principle that equality is equity, and this is the spirit of the bankrupt law.

*Cunningham,* 265 U.S. at 13, 44 S.Ct. at 427. *See also In re Atlantic Mortgage Corp.,* 69 B.R. 321, 329 (Bankr.E.D.Mich.1987); *In re U.S. Lines, Inc.,* 79 B.R. 542 (Bankr.S.D.N.Y. 1987).

While MBE may not have been truly a "Ponzi" in the worst sense of that term, the principle involved is applicable here based more on the situation as between the various claimants to the funds rather than the savoriness of the perpetrator of the wrong. It therefore appears to this Court that:

(a) While they have not done so, other persons whose monies were deposited in the Account are, or were, similarly situated and could with equal force advance the same tracing arguments and equities as Distral;

(b) The fact others have not advanced the same argument does not remove their existence from being considered as affecting the Court's conclusion; and

(c) Distral and such others are sufficiently equally innocent in the situation to require the application of the equality is equity rule in this situation.

For the reasons set forth, the claim of Distral for $139,311.19 of the funds in the hands of the Trustee is denied.

The Trustee shall present an order consistent with this Opinion.

EXHIBIT A

Attached to Opinion of December 6, 1993

Facts relative to Account for period
10/1/86—12/15/86

| DATE | DEPOSITS | CHECKS CLEARED | ACCOUNT BALANCE |
|---|---|---|---|
| | Fwd Balance | | 227,100.37 |
| 1–Oct | 89,404.20 | 62,991.17 | 253,513.40 |
| 2–Oct | 91,540.50 | 66,191.70 | 278,862.20 |
| 3–Oct | 14,507.04 | 220,743.04 | 72,626.20 |
| Sub-total | 195,451.74 | 349,925.91 | |
| | | | |
| 3–Oct | Fwd Balance | | 72,626.20 |
| 6–Oct | 649,636.30 | 12,058.39 | 710,204.11 |
| 7–Oct | 126,996.41 | 372,478.05 | 464,722.47 |
| 8–Oct | 770,224.50 | 172,454.73 | 1,062,492.24 |
| 9–Oct | | 150,808.98 | 911,683.26 |
| 10–Oct | 23,445.88 | 524,774.56 | 410,354.58 |
| 13–Oct | | | 410,354.58 |
| 14–Oct | | 98,178.54 | 312,176.04 |
| 15–Oct | 18,310.43 | 112,629.88 | 217,856.59 |
| 16–Oct | 395.00 | 56,667.37 | 161,584.22 |
| | | | |
| Sub-total | 1,589,008.52 | 1,500,050.50 | |
| | | | |
| | Fwd Balance | | 161,584.22 |
| 17–Oct | 828,798.56 | 166,035.53 | 824,347.25 |
| 20–Oct | 10,333.62 | 28,697.54 | 805,983.33 |
| 21–Oct | | 29,388.79 | 776,594.54 |
| 22–Oct | | 122,130.73 | 654,463.81 |
| 23–Oct | 57,154.43 | 102,937.21 | 608,681.03 |
| 24–Oct | 80,403.79 | 204,706.29 | 484,378.53 |
| 27–Oct | 3,612.16 | 123,808.70 | 364,181.99 |
| 28–Oct | 215,789.52 | 227,411.64 | 352,559.87 |
| 29–Oct | 10,734.45 | 24,753.06 | 338,541.26 |
| 30–Oct | 339,285.25 | 38,251.95 | 639,574.56 |
| 31–Oct | 4,454.50 | 98,193.33 | 545,835.73 |
| 3–Nov | 160,981.81 | 231,637.06 | 475,180.48 |
| 4–Nov | 203,762.00 | 89,643.11 | 589,299.37 |
| 5–Nov | 11,447.54 | 225,720.02 | 375,026.89 |
| 6–Nov | 119,909.00 | 116,047.30 | 378,888.59 |
| 7–Nov | 68,077.33 | 27,722.10 | 419,243.82 |
| 10–Nov | | 103,240.92 | 316,002.90 |
| 12–Nov | 34,209.06 | 60,951.01 | 289,260.95 |
| 13–Nov | 49,188.38 | 218,618.41 | 119,830.92 |
| 14–Nov | 17,263.20 | 41,040.62 | 96,053.50 |
| | | | |
| Sub-total | 2,215,404.60 | 2,280,935.32 | |

| DATE | DEPOSITS | CHECKS CLEARED | ACCOUNT BALANCE |
|---|---|---|---|
| Fwd Balance | | | 96,053.50 |
| 17–Nov | 22,473.96 | 19,432.63 | 99,094.83 |
| 18–Nov | 171,803.13 | 47,500.33 | 223,397.63 |
| 19–Nov | | 69,225.95 | 154,171.68 |
| 20–Nov | 234,300.12 | 183,298.46 | 205,173.34 |
| 21–Nov | 128,672.00 | 117,265.27 | 216,580.07 |
| 24–Nov | 106,291.03 | 58,122.70 | 264,748.40 |
| 25–Nov | 265,454.41 | 277,409.63 | 252,793.18 |
| 26–Nov | | 89,342.11 | 163,451.07 |
| 28–Nov | | 33,464.71 | 129,986.36 |
| 1–Dec | 244,805.75 | 6,003.17 | 368,788.94 |
| 2–Dec | 87,572.19 | 276,134.28 | 180,226.85 |
| 3–Dec | 375,507.00 | 61,441.12 | 494,292.73 |
| 4–Dec | | 90,891.44 | 403,401.29 |
| 5–Dec | 35,124.87 | 189,482.96 | 249,043.20 |
| 8–Dec | 22,891.65 | 140,234.60 | 131,700.25 |
| 9–Dec | 4,649.00 | 94,796.08 | 41,553.17 |
| 10–Dec | 2,103.36 | 50,686.70 | (7,030.17) |
| Sub-total | 1,701,648.47 | 1,804,732.14 | |
| Fwd Balance | | | (7,030.17) |
| 11–Dec | 192,258.69 | 52,700.42 | 132,528.10 |
| 12–Dec | 239,595.48 | 152,434.22 | 219,689.36 |
| 15–Dec | 45,958.50 | 62,001.10 | 203,646.76 |
| Sub-total | 477,812.67 | 267,135.74 | |
| TOTAL | 15,115,414.27 | 14,934,350.29 | |